1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    FRANK DIXON,                                No.  2:10-cv-0631 JAM AC P

12                 Petitioner,

13          v.                                    FINDINGS & RECOMMENDATIONS

14    JAMES YATES,

15                 Respondent.

16

17          Petitioner, a state prisoner proceeding with retained counsel, seeks a writ of habeas corpus

18    pursuant to 28 U.S.C. § 2254.  On July 19, 2001, petitioner was convicted by a jury of second

19    degree murder.  He was sentenced on October 19, 2001 to an indeterminate state prison term of

20    eighteen years to life.  Petitioner challenges his conviction and sentence on one ground:

21    ineffective assistance of counsel "by counsel's failure to investigate and present a wide range of

22    medical, forensic, and lay testimony in support of petitioner's defense."  ECF No. 1 (Petition), p.

23    6.  Before the court is respondent's long-pending motion to dismiss the petition as untimely.

24          Respondent initially filed the motion on June 18, 2010.  ECF No. 8.  Petitioner opposed

25    dismissal, contending that his diligence in pursuing state habeas remedies and his actual

26    innocence supported equitable tolling of the statute of limitations.  ECF No. 11.  On February 7,

27    2011, the previously-assigned magistrate judge recommended that the motion to dismiss be

28    granted.  Thereafter, in response to petitioner's objections, District Judge Damrell ordered the

1

1    matter stayed pending the en banc rehearing of Lee v. Lampert, 610 F.3d 1125 (9th Cir. 2010).

2    ECF No. 23 (order filed March 22, 2011).  The case was reassigned to District Judge Mendez on

3    April 5, 2012.  ECF No. 24.  On April 20, 2012, the district judge lifted the stay in light of the

4    August 2, 2011 en banc decision in Lee, 653 F.3d 929 (9th Cir. 2011), which held that a credible

5    showing of actual innocence may support tolling of the one-year statute of limitations imposed by

6    the AEDPA.  ECF No. 25.  Supplemental briefing was ordered on the question whether

7    petitioner's claim of actual innocence excused him from compliance with AEDPA's limitation

8    period, and the matter was remanded to the magistrate judge.  Id.  The supplemental briefs were

9    timely filed.  ECF No. 28 (petitioner's supplemental brief), ECF No. 31 (respondent's opposing

10   brief).[1]  The case was reassigned to the undersigned by Order filed on November 27, 2012.  ECF

11   No. 32.

12       I.       OVERVIEW OF THE CASE

13          The criminal case against petitioner arose from the fatal shooting of his best friend, Barry

14   O'Connell, in 2000.  It is undisputed that petitioner did not intend to kill O'Connell, and that

15   petitioner's shotgun had discharged unintentionally.  The question at trial, on which second

16   degree murder liability turned, was whether petitioner had acted with implied malice – that is,

17   whether his handling of the shotgun was dangerous to human life, and whether he acted with

18   subjective knowledge of and conscious disregard for that danger.  The defense contended that the

19   shooting had been nothing more than a tragic accident.  The defense argued that the gun

20   discharged accidentally when petitioner stumbled, and that petitioner had not appreciated the

21   danger that the loaded gun presented due to the effects of prescription painkillers.  Counsel

22   presented no medical evidence to support this theory about painkillers, and presented no forensic

23

---

24   [1] Petitioner's brief is titled "Brief In Support Of A Merits Determination Based On A Showing Of
25   Actual Innocence."  The only question presently before the court is whether the petition should be
     dismissed as untimely.  While the actual innocence question relevant to equitable tolling overlaps
26   with the merits of petitioner's ineffective assistance of counsel claim, the issues are not identical.
     The merits of petitioner's claim for relief are not the subject of these findings and
27   recommendations.  The court accordingly disregards the arguments of both parties that go to
     analysis under Strickland v. Washington, 466 U.S. 668 (1984), including matters related to the
28   performance of trial counsel.

2

1    firearms evidence to support the theory that the gun could have discharged without petitioner

2    having deliberately released the safety lever.  Those omissions form the basis of petitioner's

3    ineffective assistance of counsel claim.

4        Evidence to support the defense theories regarding the gun and regarding petitioner's

5    mental state was developed post-conviction to support petitioner's claim for habeas relief under

6    Strickland v. Washington, 466 U.S. 668 (1984).  The same evidence is offered here to establish

7    petitioner's factual innocence of implied-malice murder, and thereby escape the harsh

8    consequences of AEDPA's statute of limitations.

9        II.     THE ACTUAL INNOCENCE EXCEPTION TO THE STATUTE OF LIMITATIONS

10       This case was remanded to the undersigned for the sole purpose of determining whether

11   petitioner is entitled to equitable tolling on the basis of his claim of actual innocence.  As the

12   magistrate judge previously assigned to the case found, the petition filed on March 17, 2010 is

13   untimely by more than five years absent equitable tolling, because the time for filing it expired on

14   November 11, 2004.[2]  ECF No. 20 at 3.  Petitioner does not dispute this calculation of the

15   "presumptive" deadline under § 2244(d)(1).  See ECF No. 11 at 8.

16       In general, a habeas petitioner is entitled to equitable tolling of AEDPA's one-year statute

17   of limitations only if he has pursued his rights diligently but some extraordinary circumstance

18   stood in his way and prevented timely filing.  See Holland v. Florida, 130 S. Ct. 2549, 2562

19

20   [2] The Third District Court of Appeal affirmed the judgment on May 15, 2003.  Lodged Document
     2.  The California Supreme Court denied review on August 13, 2003.  Lod. Docs. 3-4.  The
21   statute of limitations began to run the day after November 11, 2003, when petitioner's conviction
     became final on direct review, and expired (absent tolling) on November 11, 2004.  See 28 U.S.C.
22   § 2244(d)(1)(A); Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999); Patterson v. Stewart,
     251 F.3d 1243, 1246 (9th Cir.), cert. denied, 534 U.S. 978 (2001).  Petitioner is not entitled to
23   statutory tolling under AEDPA, which applies when a state application for collateral relief is
     pending during the limitations period, because he did not file his initial state habeas petition until
24   two years after the deadline had passed.  Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001), cert.
     denied, 538 U.S. 949 (2003).  The first of petitioner's three state habeas petitions was filed in
25   Sacramento County Superior Court on November 13, 2006 and denied on December 18, 2006.
     The second state habeas petition was filed on October 9 (or 23), 2007, in the California Court of
26   Appeal, Third Appellate District, and denied on February 21, 2008.  The third petition filed in the
     California Supreme Court on April 30, 2008 was denied on March 18, 2009.  Lod. Docs. 5-10.
27   The instant petition was filed on March 17, 2010.  ECF No. 1.
28

1  (2010); Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009).  The diligence required is

2  "reasonable diligence," not "maximum feasible diligence."  See Holland, 130 S. Ct. at 2565; see

3  also Bills v. Clark, 628 F.3d 1092, 1096 (9th Cir. 2010).

4      Since this case was filed, the Ninth Circuit and the Supreme Court have both held that a

5  showing of actual innocence can satisfy the requirements for equitable tolling.  Lee v. Lampert,

6  653 F.3d 929, 937 (9th Cir. 2011) (en banc); McQuiggin v. Perkins, 133 S. Ct. 1924, 1928

7  (2013).  "[W]here an otherwise time-barred habeas petitioner demonstrates that it is more likely

8  than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the

9  petitioner may pass through the Schlup [v. Delo, 513 U.S. 298 (1995)][3] gateway and have his

10  constitutional claims heard on the merits."  Lee v. Lampert, 653 F.3d at 937; accord, McQuiggin,

11  133 S.Ct. at 1928.  In order to warrant equitable tolling, a petitioner claiming actual innocence

12  must satisfy the Schlup standard by demonstrating "that it is more likely than not that no

13  reasonable juror would have convicted him in the light of the new evidence."  Lee, 653 at 938.

14  Actual innocence in the miscarriage of justice context "means factual innocence, not mere legal

15  insufficiency."  Bousley v. United States, 523 U.S. 614, 623-24 (1998); Sawyer v. Whitley, 505

16  U.S. 333, 339 (1992) (citing Smith v. Murray, 477 U.S. 527 (1986)); Jaramillo v. Stewart, 340

17  F.3d 877, 882-83 (9th Cir. 2003) (accord).

18      While the standard is exacting, permitting review only in an "extraordinary" case,

19  "absolute certainty" as to a petitioner's guilt or innocence is not required.  Id. (quoting House v.

20  Bell, 547 U.S. 518, 538 (2006)).  To make a credible claim of actual innocence, petitioner must

21  produce "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy

22  eyewitness accounts, or critical physical evidence – that was not presented at trial."  Schlup, 513

23  U.S. at 324.  The habeas court then considers all the evidence: old and new, incriminating and

24  exculpatory, admissible at trial or not.  House, 547 U.S. at 538.  On this complete record, the

25  court makes a "'probabilistic determination about what reasonable, properly instructed jurors

26

27  [3] In Schlup, the Supreme Court announced that a showing of actual innocence could excuse a
procedural default and permit a federal habeas court to reach the merits of otherwise barred

28  claims for post-conviction relief.

4

1  would do.'"  Id. (quoting Schlup, 513 U.S. at 330).

2       Petitioners asserting convincing actual innocence claims need not also prove diligence in

3  order "to cross a federal court's threshold."  McQuiggin, 133 S. Ct. at 1935.  An "unjustifiable

4  delay on a habeas petitioner's part" does not constitute "an absolute barrier to relief."  Id.

5  However, timing is a factor that the court should consider "in determining whether actual

6  innocence has been reliably shown."  Id.  "Unexplained delay in presenting new evidence bears

7  on the determination whether the petitioner has made the requisite showing."  Id.

8       III.    THE EVIDENCE

9       A.  Trial Testimony

10       Petitioner lived in Sacramento with his wife Yvonne and their three children.  Petitioner's

11  parents also lived in Sacramento, and petitioner and his wife assisted his father, Frank Sr., with

12  the care of his mother Beth, who had dementia.  Petitioner's sister France, who had previously

13  had been living in Germany, was staying temporarily with Beth and Frank Sr. while her husband,

14  who was in the army, relocated from Germany to North Carolina.  On the morning of September

15  23, 2000, a family friend named Darlene called petitioner's house and spoke to Yvonne.  Darlene

16  reported that France, France's mother-in-law, and a home health nurse had been "ganging up" on

17  Frank Sr. to convince him to move Beth from Sacramento to North Carolina.  Petitioner was

18  upset when Yvonne told him what she had learned from Darlene.

19       Yvonne testified that petitioner was not happy with the idea that his mother might be

20  permanently moved against his father's wishes.  Petitioner said that France needed to move out of

21  Beth and Frank Sr.'s home, and that they needed to speak with Frank Sr. to see if he could get her

22  moved out.  If not, petitioner told his wife, he would have to move France and her belongings out

23  of his parents' house himself.  Yvonne told petitioner, who was on medication for back pain

24  following an injury, that he could not move France's boxes because his back had been "really

25  hurting," he could not bend, and he was "going to spasm."  According to Yvonne, petitioner's

26  back pain prevented him from sitting, sleeping or walking for long.

27       Yvonne telephoned petitioner's best friend, Barry O'Connell, and had him speak with

28  petitioner about the situation.  O'Connell told Yvonne that petitioner was not making sense.  She

then arranged for both O'Connell and Frank Sr. to come to petitioner's house to talk.  The two men arrived at the same time, around 11:25 a.m.

Prior to the arrival of O'Connell and Frank Sr., petitioner had spent the morning in the master bedroom.  When Yvonne went in to talk to him, he was sitting on a chair in the walk-in closet, trying to open his gun safe.  Petitioner was an avid gun collector.  Most of petitioner's guns were kept in the safe in the closet.  Guns not in the safe, including a shotgun, were kept in gun cases under piles of bags and other things in the closet.  Petitioner shared his interest in firearms with O'Connell, and they frequently went shooting together.  O'Connell knew the combination to petitioner's gun safe; Yvonne did not.  Petitioner asked Yvonne to have O'Connell bring the combination when he came.  Yvonne tried to reach O'Connell with this request, but he had already left for petitioner's house.

After O'Connell and Frank Sr. arrived, petitioner talked with his father briefly about whether France and her things should be moved out.  After the conversation, petitioner stumbled back to his bedroom and returned holding his shotgun, which was pointed up toward the ceiling. Petitioner walked toward Yvonne, O'Connell and Frank Sr.  Yvonne thought petitioner was going to go out the front door, and was concerned that he might go over to France's.  Yvonne moved toward the door to head him off.  As she turned away from the men, she heard Frank Sr. say, "my hip, my hip," and turned back to see her father-in-law bumping into some boxes and grabbing a table to stabilize himself.  She turned back toward the door again and heard a bang.  Neither Yvonne nor Frank Sr. was looking at O'Connell at the time of the shot.  When Yvonne turned back toward the men, all three were standing.  O'Connell then fell to the ground.  Petitioner did not have the gun in his hands; it had fallen to the floor.  Yvonne called 911 within seconds of the gunshot.

When interviewed by the police that day, Yvonne reported that petitioner was "very upset" prior to the shooting and had walked to his room with a "mad walk" before returning with the gun.  At trial, she testified that petitioner had engaged in a "regular, everyday conversation" rather than an argument, and that he had walked to his room with a stumbling gait.  At the preliminary hearing, Yvonne testified that petitioner's behavior prior to the shooting had been

6

1    "irrational."  At trial, she testified that "illogical" was a more accurate description.  She explained

2    on cross-examination that petitioner was on a lot of medication, and that his thoughts and

3    conversation had skipped and jumped around the whole summer.

4         Frank Sr. testified that Barry O'Connell was like a brother to petitioner and like a son to

5    him.  On the morning of the shooting petitioner was upset about his sister, but was not angry and

6    was not upset at anyone at the house.  When he told a detective that petitioner had been angry, it

7    was a poor choice of words.  Frank Sr. and Barry O'Connell both told petitioner to calm down,

8    then petitioner went into the bedroom and returned with the rifle.  Petitioner's right hand was on

9    the rifle's stock and his left hand was holding the gun up.  The rifle was held high and pointed

10   toward the ceiling as petitioner approached the others.  Either right before or right after he got the

11   gun, petitioner said, "She's got to go."  Petitioner was not threatening anyone.  He did not shake

12   or point the gun, or say anything about hurting or scaring anyone.  Petitioner had never been

13   violent.

14        As petitioner tried to pass his father in the corridor, he bumped against Frank Sr.  Their

15   feet got tangled up, and Frank Sr. fell on some boxes.  He heard a gunshot while he was falling.

16   He got up, turned around, and saw O'Connell standing up and then saw him fall right away.

17   Frank Sr. had not reported to the police that petitioner had had bumped into him and knocked him

18   over, or that he was facing away from O'Connell when the gun fired.  He denied that he and

19   O'Connell had been standing side by side to block petitioner's passage.  Petitioner was shocked,

20   panicked and upset that he had shot his best friend.

21        Dr. Gregory Reiber was the forensic pathologist who conducted the autopsy of Barry

22   O'Connell.  Dr. Reiber testified that O'Connell had bled to death internally from a shotgun

23   wound to the abdomen.  Shotgun pellets had penetrated several of his organs.  According to Dr.

24   Reiber, O'Connell's injury was "a contact range shotgun entrance wound."  By "contact," the

25   pathologist meant that "[t]he end of the [gun's] muzzle [was] touching perhaps even pressed

26   slightly against the skin."  The injury was more to the front than the back side and the shotgun

27   would have been "relatively level" and "pretty close if not exactly horizontal" to the ground if

28   O'Connell were standing erect.

Sacramento Police Detective Keith Burgoon conducted the investigation of the crime scene on September 23, 2000.  Det. Burgoon described the scene and narrated a video that focused primarily on the interior of the house.  The house was filthy and cluttered.  Det. Burgoon identified various items of evidence including the gun case, the gun, the victim's T-shirt, and the eight live rounds found in the shotgun at the scene.  The gun case had been locked when he arrived on the scene, and ammunition and weapons were kept separately in the house.  There were two .12-gauge shotguns in the house, as well as five rifles, a handgun and .22 caliber shells in an open cabinet at the right of the front door.  Numerous bottles of prescription medication, including Percocet and Valium, were on the sink in the master bathroom.

Sacramento Police Detective John Keller interviewed petitioner following the shooting.  A videotape of the interview was played for the jury.  At the beginning of the interview Det. Keller falsely told petitioner that O'Connell was still alive, to keep petitioner from becoming too upset to be interviewed.  Petitioner was very emotional about the shooting, crying and covering his face with his hands.  He told Det. Keller that only O'Connell knew the combination to petitioner's gun safe, and that he was just getting the combination from him.  Many times during the interview, petitioner responded to questions by saying that he did not remember or did not know the answer. Petitioner reported that he and the victim had never fought or argued, and that the victim had come over to help mediate a matter in petitioner's family.  Petitioner said that his sister brought stress to his father's home, but also said there was no argument going on in his own house that day.  Petitioner did not argue with his father that morning and was not upset or angry.  Petitioner said that he did not remember pulling the trigger, and insisted that he would never kill Barry. Petitioner suggested the gun had discharged accidentally.  Petitioner also told Keller several times that he does not keep guns loaded, that had neither shouldered or pointed the gun, and that he did not want to threaten or hurt his sister or Barry O'Connell.  Petitioner reported that he had been taking medication for his back.  At the end of the interview, Det. Keller informed petitioner of the victim's death and petitioner became extremely distraught.  Det. Keller observed an abrasion on the web of petitioner's right hand between the thumb and index finger.  The injury was photographed.

Criminalist Faye Springer testified that the weapon that shot O'Connell was a pump action shotgun.  The magazine held eight rounds with another in the chamber.  In order for the gun to fire, the safety would have to be put into the fire position and the trigger pulled.  The safety lever was below the sight and above the trigger.  If the safety switch was slid back, the safety was on.  To switch the safety off, the lever had to slide forward.  With a round in the barrel, pulling the trigger would shoot the shell.  Ms. Springer did not consider the shotgun to have a hair trigger.  The shotgun had a four-pound trigger pull which was in the normal range, while a hair trigger would have a trigger pull of one pound or less.  The victim's wound occurred from "a tight contact type of shot," meaning that "the end of the shotgun was pretty much in tight contact with the victim's body even to the extent that the flesh lapped or . . . draped over the end of the shotgun . . . ."  Ms. Springer also testified on direct that the rear sight of the gun, known as a "ghost" sight, protruded above the gun's frame and could have caused the injury to petitioner's hand as his hand slipped or slid up the gun.  On cross, she opined that the weapon was oriented with the top sight toward the victim's stomach and the magazine toward the ground and in a turned position.  She also agreed that a weapon fired correctly would not result in a cut to the hand.  However, when asked if it were possible for a moving hand to have been cut on the ghost sight and also to have moved the adjacent safety, she did not think so because the "[s]afety is pretty stiff."

Petitioner testified on his own behalf.  He told the jury that he and O'Connell had known each other since their freshman year in high school.  They had been best friends ever since, were in contact every night, and O'Connell visited petitioner's home no less than once or twice a week.  Petitioner and O'Connell had been collecting guns for twenty years; they each bought the same model of gun safe together.  The guns that petitioner kept in his bedroom walk-in closet rather than the gun safe would not fit in the safe.  Also one shotgun stayed out because it was a home defense weapon, but it was kept locked in a black case.  Although petitioner generally stored his ammunition and weapons separately, the home defense shotgun was kept loaded.  It had been loaded to capacity back in March; petitioner had not loaded the gun on the morning of September 23.  Petitioner acknowledged that boxes of shells had been found on a table, open and uncovered,

but said that they "could have been sitting there for quite a long time" amidst the substantial clutter of the house.  On the day of the shooting, petitioner was taking Percocet as a painkiller, Valium as a muscle relaxant, and Indocin as an anti-inflammatory.  The medications made him sleepy and resulted in a fragmented memory.  He testified he was very close to his sister and had never threatened her.

At some point on the morning of the incident, petitioner thought that it would be best to move the shotgun into the gun safe.  When he tried to open the safe, he could not remember the combination.  Only he and O'Connell knew the combination.  When he heard voices that sounded like his father's and O'Connell's, he walked out of his bedroom to get the combination from O'Connell.  He brushed up against his father as he approached O'Connell, heard his father say "my hip, my hip," and saw him stumble.  Petitioner testified that he lost his balance a bit and heard a bang.  He was startled and did not know what made the sound.  He looked at O'Connell, who was standing, heard him say petitioner's name, then saw him fall over.  The shotgun was not in petitioner's hands.  Petitioner fell to his knees, put his hand under O'Connell's head, grabbed his hand, and said, "Oh, Barry."

Petitioner was unable to explain how the shotgun went from pointing upward at the ceiling to firing horizontally into O'Connell's abdomen.  He testified it probably occurred as he began to fall, although he did not go to the ground.  Petitioner agreed that if he had used the gun to push O'Connell out of the way, it would be a complete violation of basic firearms rules and an incredibly reckless act.  But he testified that he took the weapon out of the bedroom with him only to get the gun safe combination.  Although concerned and confused, he was not particularly upset or agitated that day.

B.  Newly Presented Evidence

Petitioner submits additional evidence on two issues: (1) his impaired mental functioning at the time of the shooting, offered to prove that he did not subjectively appreciate the danger posed by handling the loaded shotgun, and (2) the functioning of his shotgun, offered to prove that it could have discharged without the safety having intentionally been released.  The same body of evidence is offered in support of the ineffective assistance claim, on the theory that trial

counsel's failure to develop and present the evidence at trial violated Sixth Amendment standards, and in support of equitable tolling on an actual innocence theory.

### 1. Evidence Regarding State of Mind

#### a. Medical Evidence

*Dr. Yokoyama*

Petitioner presents a report from his treating physician at the time of the shooting, Donald S. Yokoyama, M.D., and his medical records from the period in question. State Habeas Petition (Lodged Doc. 9), Exh. A (Yokoyama Dec.), C (medical records).[4] Dr. Yokoyama reports that petitioner was seen in his office on June 29, 2000 for a back injury sustained in a fall the previous day. Petitioner was treated regularly for back pain and muscle spasms over the months that followed, and was prescribed pain killers and muscle relaxants over the course of the summer and through the time of the shooting. In September of 2000 Dr. Yokoyama was prescribing "a very strong pain medication," Percocet 7.5, for "severe pain." He had explained to petitioner that "the medication could carry along with it certain side effects including decreased level of alertness, decreased physical coordination and agility and some general cognitive deficits." Id. Because of these side effects, petitioner was unable to drive. Petitioner took Valium at night as well as Percocet. He reported to Dr. Yokoyama that he was experiencing difficulty concentrating during the day. Attempts to lower the dosage of Percocet to improve cognition were unsuccessful due to petitioner's pain level. On September 15, 2000, a week before the shooting, Dr. Yokoyama saw petitioner at an office visit and determined that the 7.5 milligram potency continued to be medically necessary. Accordingly, on September 18 Dr. Yokoyama completed insurance paperwork to justify the continued prescription. Dr. Yokoyama had deemed petitioner temporarily disabled and authorized him to be off work at least until October 1, 2000. Exh. A (Yokoyama Dec.).

The medical records document Dr. Yokoyama's treatment, and confirm the declaration of petitioner's wife Yvonne Dixon (Exh. B) who states that she and petitioner's doctor spent months

---

[4] All subsequently cited exhibits were submitted to the California Supreme Court in Case No. S163142, and are found at Lodged Doc. 9.

1   trying to determine an effective pain management regimen for petitioner.  The records reflect that

2   beginning at the end of June petitioner took Soma, Vicodin, Naprocen, Loratab and Tordol before

3   settling on Percocet, Valium and Indocin.  In addition to pain and muscle spasms in his back,

4   petitioner experienced chronic pain in his knees.  Exh. C.

5       *Dr. Victor*

6       Forensic psychiatrist Bruce S. Victor, M.D., was retained by post-conviction counsel to

7   review the trial record and petitioner's medical records and evaluate the factors affecting

8   petitioner's mental state at the time of the shooting.  Exh. L (Victor Dec.).  Dr. Victor focused on

9   the subjective component of implied malice -- that is, on petitioner's knowledge of the

10  dangerousness of his actions and conscious disregard of that danger -- and assumed that

11  petitioner's act in retrieving a loaded shotgun and handling it while in the presence of his wife,

12  father and friend constituted an act that was objectively dangerous to human life.  Exh. L at 160.

13      Dr. Victor identifies four factors that militate against a finding that petitioner knew of the

14  danger or acted with conscious disregard of it.  First, petitioner had no history of violence or of

15  dangerous handling of firearms.  Because the brandishing of the shotgun was atypical behavior,

16  "any psychiatrist reviewing this case would ask the question of what would have been the

17  requisite change in [petitioner's] life to cause him to behave in a manner so uncharacteristic of his

18  prior functioning."  Id. at 161.  Second, petitioner had a number of serious medical problems that

19  affected his judgment and mental state in September 2000.[5]  Chronic uncontrolled pain "would

20  certainly have reduced his general level of judgment and his capacity to recognize the larger

21  consequences of his actions."  Severe back pain deflects the mind's focus and thus frequently

22  results in reflexive and unconsidered behavior with respect to family members and friends.  Id. at

23  161-62.

24      Third, petitioner was taking "fairly substantial doses" of both Percocet and Valium at the

25  time of the shooting.  Percocet can adversely affect cognitive abilities.  The observations of

26  petitioner's wife, who Dr. Victor interviewed, are consistent with the adverse cognitive side-

27

28  _____

[5] Petitioner was morbidly obese and suffered knee pain as well as back pain.

1   effects of Percocet.  Valium also adversely affects cognition and interferes with short-term

2   memory formation.  A person taking Valium can appear to take part in ordinary intentional

3   conduct without having any memory of it due to the chemical effect of the drug.  Valium can also

4   have a disinhibitory effect and predispose an individual toward more risky behavior.  Id. at 161-

5   62.  "Applied to the circumstances of this case, Mr. Dixon's use of prescription Valium may have

6   reduced his sensitivity to information about the danger of carrying a weapon in the presence of

7   others, i.e., a reduced awareness of the risk to others, and induced a disinhibitory response to any

8   concern about gun safety, i.e., a lack of conscious disregard of any danger produced by his

9   conduct."  Id. at 162.  Finally, Dr. Victor points to the fact that petitioner was experiencing acute

10   and chronic sleep deprivation in August and September 2000 as the result of his back pain,

11   weight, and overall poor physical condition.  Sleep deprivation can adversely impact judgment,

12   social awareness and impulse control.

13        Dr. Victor concludes as follows: "It is my opinion that . . . as of September 2000

14   [petitioner's] mental functioning was so compromised by the combination of factors listed above

15   that it is highly unlikely he recognized any danger to others resulting from his handling of a

16   weapon in their proximity, much less that he consciously disregarded that danger, which all of the

17   available evidence indicates that he certainly would not have disregarded in his normal frame of

18   mind."  Id. at 164.  Dr. Victor attests that any reasonably qualified psychiatrist with knowledge of

19   the prescribed medication "would have been able to identify and explain to the jury the unusually

20   potent array of physiological and pharmacological factors that would have interfered with Mr.

21   Dixon's usual ability to act with appropriate safety at the time of the homicide."  Id. at 165.

22                              b.  Blood Sample Analysis

23        A sample of petitioner's blood was drawn and preserved shortly after the shooting, but

24   was not analyzed until after petitioner was convicted.  The post-conviction toxicology report

25   shows that petitioner had oxycodone in his system when the shooting occurred.  Exh. D (Report

26   of Toxicologist Jeffrey Zehnder).

27                              c.  Observations of Petitioner's Physical and Mental Condition

28        The declaration of Mark Graybill, who had known petitioner for approximately 10 years

at the time of the shooting, describes the mobility limitations and memory problems that Graybill observed in petitioner from June or July to mid-September of 2000, during the time that petitioner was being treated for severe back pain. Exh. E (Graybill Dec.). When Graybil and petitioner went to an air show in Reno together, petitioner could not walk around the exhibit area as he usually did. He was unsteady on his feet. At a birthday party petitioner was clumsy and had difficulty positioning himself on a bench. Anytime petitioner and Graybill went anywhere together, they needed to make sure that a place to sit was always immediately available. Petitioner was unable to drive because of the medication he had to take for the pain. On multiple occasions Graybill witnessed petitioner unable to place a telephone call to a familiar number because he could not remember the number. Petitioner also had a trouble using telephone keypads, appearing indecisive and unable to push the correct buttons with the right amount of pressure. Petitioner repeated himself, retelling stories he had just recounted as though he had not just told them. He would forget plans he had made with Graybill and conversations they had. His speech was sometimes slurred. It could be hard to get his attention. Graybill talked with petitioner about his coordination and memory problems, and discussed his concerns about petitioner's condition with both Yvonne and Barry O'Connell.

The declaration of Yvonne Dixon provides additional anecdotes that illustrate petitioner's physical and mental impairments in the weeks prior to the shooting. Exh. B (Yvonne Dixon Dec.). Petitioner stopped driving after an incident in July 2000 in which he was taking Yvonne to lunch, failed to notice the brake lights on the car in front of him, and almost rear-ended the other car. His walking gait changed during the time he was on painkillers to shuffling and stumbling, and he was increasingly uncoordinated. Petitioner frequently took to bed, and was unable to keep track of time or take care of the children. On petitioner's birthday he asked whether they were getting together with friends to celebrate, having completely forgotten several conversations in which Yvonne had explained that the celebration was being delayed due to his poor health. Yvonne also noted a personality change in which petitioner went from his usual easy-going self to being more easily upset over small things, and prone to discouragement and depression. She attributed this personality change to the effects of chronic pain. Exh. B. Yvonne had relayed the

14

1   story about petitioner's birthday to police after the shooting, along with another example of his

2   impaired memory.  Exh. F (transcript of Yvonne Dixon interview).

3                    2.  Evidence Regarding the Gun

4        Petitioner presents the report of an independent firearms analyst, John Jacobsen, who

5   examined the shotgun and reviewed Criminalist Faye Springer's report.  Exh. G.  Contrary to

6   Springer's findings, Jacobson concludes (1) that the injury to the base of petitioner's right thumb

7   was caused by collision with the safety switch, and (2) that the safety could be switched off by a

8   hand forcibly sliding over it.  Jacobson determined that the location of the injury on petitioner's

9   hand is more consistent with the location of the safety switch than that of the rear gun sight.

10  Jacobsen also simulated the incident by dabbing fingerprint powder on the safety lever, holding

11  the gun by its grip, and forcing the muzzle into a hard surface.  The impact forced his hand over

12  the safety switch, moving it into the fire position and leaving a mark in the same location on

13  Jacobson's gloved hand as the injury to petitioner's hand.  Photographic comparison of

14  petitioner's injured hand and the powder impression left on Jacobson's hand by the simulation

15  demonstrate a close similarity of both location and impact pattern.  The results of Jacobson's

16  simulation contradict Springer's testimony that the safety switch could not be moved into the fire

17  position by a hand sliding over it accidentally.

18  IV.    ANALYSIS

19       The question before the court is whether any reasonable juror could find proof of implied

20  malice beyond a reasonable doubt in light of all the evidence.  Lee v. Lambert, 653 F.3d at 937;

21  Perkins v. McQuiggin, 133 S.Ct. at 1928.  Without proof of implied malice, petitioner could not

22  be convicted of second degree murder.  If no rational juror could find implied malice in light of

23  all the evidence now before this court, House v. Bell, 547 U.S. at 538, then petitioner is actually

24  innocent of second degree murder.[6]

25

26  _____

27  [6] The issue is not, as respondent would have it, whether petitioner is actually innocent of killing
    Barry O'Connell.  See ECF No. 31 at 23.  Petitioner is indisputably responsible for the homicide.
    Because petitioner's conviction was for second degree implied-malice murder, the question is

28  whether he is actually innocent of acting with implied malice.

1        A. <u>California Law of Implied Malice Murder</u>

2        Murder is the unlawful killing of a human being with malice.  Cal. Pen. Code § 187.

3   Malice may be express, as where there is a deliberate intention to kill, or implied.  Malice is

4   implied, supporting second degree murder liability, where (1) the killing is caused by an act

5   dangerous to human life, (2) the defendant deliberately performed the act, and (3) the defendant

6   acted with knowledge of the danger and conscious disregard for life.  <u>People v. Knoller</u>, 41 Cal.

7   4th 139, 143, 151 (2007).  Subjective appreciation of the risk is essential to implied malice, and

8   distinguishes second degree murder from criminal negligence and manslaughter.  <u>People v.</u>

9   <u>Watson</u>, 30 Cal. 3d 290, 296-97 (1981); <u>see also</u> <u>People v. Dellinger</u>, 49 Cal. 3d 1212, 1217-19

10  (1989).  "In short, implied malice requires an awareness of engaging in conduct that endangers

11  the life of another – no more, no less."  <u>Knoller</u>, 41 Cal. 4th at 143.

12       Petitioner was charged with an open count of murder, and the jury was instructed on the

13  elements of both first and second degree murder.  <u>See</u> CT 12, RT 521-22.  However, the

14  prosecutor conceded that petitioner had not intended to kill Barry O'Connell, and argued for a

15  second degree murder verdict based on implied malice.  RT 538,[7] 555-59.[8]  The prosecution

16  theory was that the gun went off while petitioner was using it to push O'Connell aside, and that a

17  loaded gun with the safety off cannot be used in such a manner without knowledge of the risk to

18  human life – especially by someone as familiar with guns as petitioner.  RT 557-58, 562.  The

19  defense contended that the gun had accidentally discharged when petitioner and his father

20  bumped into each other and petitioner stumbled and began to fall.  RT 593.  The jury found

21

22  [7] "I don't think the defendant got out of bed on the 23rd and decided to kill Barry O'Connell for
    crying out loud.  Of course he didn't do that.  And he didn't walk into the front room thinking I'm
23  going to kill Barry O'Connell today.  And he didn't walk up to Barry O'Connell at – at all with
    his gun and have any intent I'm sure."  RT 538 (prosecutor's closing argument).
24

25  [8] ". . . [I]n this case the defendant did not take his gun, shoulder it, put it up, cock it, shoot it at
    Barry O'Connell. . . .  I'm not going to encourage you to you to go with the express malice theory
26  because we don't really know at that split second moment whether or not the defendant made a
    decision to actually shoot Barry because he was mad, he's in the way or if he simply used the gun
27  and pushed him out of the way.  So since we don't know that, probably going to have to give him
    the benefit of the doubt on that [actual malice] issue."  RT 555-56 (prosecutor's closing
28  argument).

petitioner guilty of second degree murder. The jury found true the special allegation that petitioner had personally used a firearm, and untrue the allegation that he had intentionally and personally discharged the firearm. CT 246; RT 529, 622.

B. The Totality Of The Evidence Does Not Rationally Support A Finding Of Implied Malice Beyond A Reasonable Doubt

The second degree murder case against petitioner was weak at best. The jury found unanimously that the gun had not been deliberately fired.[9] None of the witnesses saw the gun go off, or could explain how it discharged. Petitioner and Frank Sr. both testified that the gun fired immediately after they bumped into each other and both stumbled and began to fall. Yvonne's testimony was consistent with this version of events. The prosecutor's theory that petitioner had recklessly used his gun to push O'Connell aside was pure speculation. While that theory was consistent with the victim having sustained a contact wound, contact between the shotgun and the victim could just have easily been caused by the stumble given the close proximity of the three men at the time.

In sum, both the prosecution and defense theories about how the gun discharged depended on inferences from ambiguous circumstantial evidence. Petitioner's jury was instructed according to California law as follows:

> [A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of he crime, but (2) cannot be reconciled with any other rational conclusion.

> Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

---

[9] The deliberate discharge of a firearm without intent to kill will support a finding of implied malice. See People v. Taylor, 32 Cal. 4th 863 (2004) (affirming second degree murder liability where defendant fired gun into occupied apartment building). Where the discharge is not deliberate, however, the fact of the discharge alone cannot establish implied malice.

1

2

3

> Also, if the circumstantial evidence as to any particular count permits two reasonable inferences, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject the interpretation that points to his guilt. . . .

4  CT 179-80.

5      For the reasons explained below, petitioner's newly-presented evidence undermines the

6  foundation for inferences that are necessary to a finding that petitioner was subjectively aware of

7  the life-threatening risk posed by his handling of the loaded shotgun.

8          1.  Petitioner's Mental State and Cognitive Functioning

9      The inference of an individual's subjective mental state from his conduct generally

10  proceeds on the assumption that the individual is cognitively intact and would comprehend what a

11  reasonable (i.e. cognitively intact) person would comprehend under the circumstances.  This

12  predicate assumption is disrupted by evidence that a defendant's cognitive functioning is

13  impaired by mind-altering substances.  Under California law, therefore, voluntary intoxication

14  that prevents subjective appreciation of risk precludes a finding of malice and reduces second-

15  degree murder to manslaughter.  People v. Saille, 54 Cal. 3d 1103, 1116-17 (1991); People v.

16  Whitfield, 7 Cal. 4th 437, 451 (1994).  Petitioner's evidence creates a reasonable doubt as to

17  appreciation of risk.

18      At trial, petitioner testified that he had taken pain medication on the day of the shooting

19  and that it made him sleepy and affected his memory.  An officer testified that pain medication

20  was present in the bathroom.  Yvonne testified briefly about petitioner's back injury and pain, in

21  the context of explaining that she did not want petitioner to try to move his sister's belongings

22  himself.  The new evidence substantially expands the factual universe regarding petitioner's pain,

23  use of pain medication, and the influence of both on his functioning.  The new evidence also

24  provides the connection, missing at trial, between petitioner's use of pain medication and his

25  functioning at the time of the shooting.

26      First, the toxicology report corroborates that petitioner had medication in his system on

27  the day of the shooting.  Second, Dr. Yokoyama's declaration and the medical records confirm

28  that petitioner had been aggressively treated for severe pain for several months.  It is significant

18

that only a week before the shooting, Dr. Yokoyama confirmed to the insurance company that a high dosage of Percocet, requiring special authorization, remained medically necessary despite the fact that the medication was causing lack of alertness, poor concentration, and inability to drive.  Dr. Victor's declaration establishes that the combination of petitioner's chronic pain, pain medications, and sleep deprivation likely impaired his capacity to appreciate the dangerousness and potential consequences of his actions.  Dr. Victor opines that petitioner's "mental functioning was so compromised by [this] combination of factors… that it is highly unlikely he recognized any danger to others resulting from his handling of a weapon in their vicinity, much less that he consciously disregarded that danger…"  Exh. L at 164.  In the present context, the court considers Dr. Victor's opinions without regard to their admissibility.  See House, 547 U.S. at 538.[10]  Dr. Victor is a practicing psychiatrist and Clinical Professor of Psychiatry at the U.C. San Francisco School of Medicine, who specializes in psychopharmacology (among other things).  He is eminently qualified, and the undersigned finds that his declaration is credible.  Finally, the declarations of Yvonne Dixon and Mark Graybill present a portrait of petitioner as a man significantly impaired in mobility, cognition, and memory during the relevant time period.  Again, the court considers this evidence without regard for its admissibility at trial.  The lay declarations are credible in their level of detail, internal consistency, and in light of the declarants' familiarity with petitioner.

The newly-presented medical evidence and lay witness evidence are consistent with each other, with the evidence at trial, and with the proposition that petitioner was not sufficiently in possession of his faculties that he would likely have appreciated the danger posed by retrieving

---

[10] Because the court may consider evidence of actual innocence that would not be admissible at trial, it is unnecessary to address the distinction between diminished capacity and diminished actuality, or to distinguish opinions on ultimate questions from those regarding predicate facts. See Saille, 54 Cal.3d at 1111-12 (evidence of voluntary intoxication not admissible to negate defendant's capacity to form mental state, but is admissible on question whether the defendant actually formed the required mental state); People v. Coddington, 23 Cal.4th 529, 582 (Cal. 2000) (evidence of mental illness may be introduced on question whether "defendant actually formed a mental state that is an element of a charged offense. . .", but expert opinion "on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state" is not admissible).

1    the loaded shotgun.  Respondent argues that a decrease in alertness due to medication does not

2    mean that petitioner could not have still formed the mens rea necessary for implied malice

3    murder.  That is certainly true, but beside the point.  The question is not whether implied malice

4    was *possible* notwithstanding petitioner's impaired mental state, but whether, in light of all the

5    evidence now adduced, a reasonable juror could find implied malice *beyond a reasonable doubt*.

6          The mental state evidence also goes to petitioner's credibility.  At trial, the prosecutor

7    ridiculed the defense attempt to blame medication -- without corroboration or medical evidence –

8    for petitioner's memory gaps and his inability to explain the shooting.[11]  Dr. Victor's declaration,

9    and the lay witness declarations regarding petitioner's problems with memory and cognitive

10   processing around the time of the shooting, render petitioner's inability to explain what happened

11   understandable rather than suspect.[12]  Without the mental state evidence, petitioner's partial recall

12   and failure to provide a comprehensible account of the shooting suggest consciousness of guilt.

13   The expanded mental state record undermines the basis for such an inference.[13]

14          The newly-presented evidence is not cumulative of the evidence presented at trial.  The

15

---

16   [11] In summation, the prosecutor emphasized the absence of corroborative testimony and medical
     evidence:  "Where was just some basic corroboration in this case of anything the defendant said?.
17   . .  How about some sort of records to show that in fact he was really suffering from a back
     injury?  You'll notice in the transcript  . . . that he told Detective Keller even Pac Bell was
18   looking for some sort of documentation on his back injury.  How about something like that?  How
     about you - - how about an expert?  How about a doctor?  How about somebody to come in here
19   and say you know what, this whole memory loss thing, that's a real concern.  That's [sic] actually
     happens every time you take Percocet or Valium.  It's commonly known in the industry."  RT
20   548-549 (closing argument).  "This is a murder case.  And you would think that you would come
     up with anything you could, anything at all to corroborate what he's saying, but there's just
21   nothing there to corroborate."  RT 549 (closing argument).  "So you really, other than the fact that
     the defendant himself told you I'm having memory problems, you've got nothing reliable at all to
22   think of."  RT 608 (rebuttal argument).

23

24   [12] The prosecutor attacked petitioner's testimony and memory gaps as "self-serving fabrication."
     RT 549.

25

26   [13] The evidence of petitioner's physical clumsiness also lends credibility to his testimony that he
     simply stumbled while carrying the gun, and weakens the basis for the inference urged by the
27   prosecutor that petitioner was deliberately pushing past O'Connor in his haste to go confront his
     sister.

28

1  trial evidence included the presence of drugs in the bathroom; the newly-presented evidence

2  documents the presence of drug in petitioner's bloodstream.  The trial evidence included

3  undocumented claims of a back injury; the newly-presented evidence documents that injury and

4  its aggressive treatment with painkillers that affect cognition.  The expert medical opinion is

5  entirely new, and fills the evidentiary gap on which the prosecutor pounced at trial.[14]

6  　　　　Respondent attacks petitioner's theory of the medical evidence by arguing that trial

7  counsel investigated and rejected a voluntary intoxication defense.  This line of argument is both

8  misdirected and inadequately supported.  First, while the performance of petitioner's trial counsel

9  will be directly at issue on the merits of the closely-related <u>Strickland</u> claim, it is simply not

10  relevant to the <u>Schlup</u> inquiry.  Second, respondent relies entirely on a letter dated May 19, 2003

11  from a private investigator to petitioner's appellate attorney.  The investigator reports on a

12  meeting with trial counsel, and states in part:

13
14  　　　　　Mr. Miller stated that their investigation had included contacting
　　　　　two doctors and a pharmacist regarding the medications that Mr.
　　　　　Dixon was taking at the time of the incident.  He stated that the

15  　　　　　pharmacist thought it was possible that the medications could make
　　　　　a person unstable or clumsy but both doctors indicated that the
　　　　　prescription drugs would not have been enough for intoxication.

16

17  State Habeas Petition (Lodged Doc. 9), Exh. H.  The identities and qualifications of the

18  referenced doctors and pharmacist are not provided, the substance of the consultations is not

19  documented, and the court is without any basis for evaluating validity of the "opinion" that

20  intoxication could not be established.  There is certainly no reason to think that the professionals

21  contacted by counsel reviewed petitioner's medical records or considered the interplay of chronic

22  pain, sleep deprivation and pain medication that Dr. Victor addressed.  For these reasons, the

23  conclusory hearsay contained in Exhibit H does not constitute reliable evidence on the question of

24  petitioner's mental state.  Respondent has presented no medical evidence to rebut Dr. Victor's

25  opinion.

26  　　　　Finally, the court rejects respondent's argument that the evidence of impaired cognitive

27

28  [14] <u>See</u> supra n. 11.

1  functioning is inconsistent with the trial testimony of petitioner and Yvonne that he was behaving

2  normally on the day of the shooting.  "Normal" is a relative term, and the evidence demonstrates

3  that petitioner's functioning on the day of the shooting was "normal" in comparison to his

4  behavior since his back injury and while on pain medication.  The emphasis on "normalcy" by

5  defense witnesses must be understood in context as a rejection of the prosecution suggestion that

6  petitioner was in a state of rage over his sister's behavior.[15]  Taken as a whole the evidence

7  demonstrates that petitioner's "normal," or typical, level of functioning around the time of the

8  shooting was an impaired level of functioning.  Petitioner's evidence of that impairment, and the

9  expert opinion of Dr. Victor that his impairment prevented him from recognizing the danger his

10  conduct presented, undermines the basis for an inference of implied malice beyond a reasonable

11  doubt.

12          2.  The Shotgun's Safety Lever

13          Petitioner's jury was presented with uncontradicted expert testimony that his shotgun

14  could only fire after the safety had been deliberately moved to the "fire" position.  Given this

15  state of evidence, the jury could and presumably did conclude that petitioner had released the

16  safety deliberately, and then infer from that fact that petitioner was subjectively aware the gun

17  was ready to fire at any moment.  The newly-presented evidence creates a reasonable doubt about

18  the predicate factual finding that is necessary to the inference.  Petitioner's expert concludes,

19  contrary to the testimony of criminalist Springer, that (1) the safety lever could be moved by a

20  hand accidentally but forcefully sliding over it, and (2) the injury to petitioner's hand was more

21  consistent with abrasion on impact with the safety lever than with abrasion on impact with the

22  rear sight.  Jacobson documents the experiment he conducted with the gun, annotates Springer's

23  photographs to highlight his differences with her interpretation of the evidence, and compares her

24  photographs to his own.  State Habeas Petition (Lodged Doc. 9), Exh. G.  In light of this

25  competing expert opinion, a rational juror could not conclude *beyond a reasonable doubt* that

26  _____

27  [15] Cognitive impairment and anger about the situation with his sister are obviously not mutually
   exclusive.  It is undisputed that petitioner was upset, and not acting rationally.  For purposes of
   second degree murder liability, however, the question is not what motivated petitioner to get the

28  gun but whether he subjectively appreciated its dangerousness.

1    petitioner had deliberately set the gun to the "fire" position.

2         The Jacobson declaration does not provide a complete or entirely satisfactory theory for

3    how the shooting occurred.  The exact position of the gun and of petitioner's hands on the gun at

4    the time he stumbled, the movements of petitioner's body and of the gun as he fell, how the gun

5    contacted O'Connell's body, exactly how the safety lever was released and the trigger pulled, are

6    all unknown.  However, it is petitioner's burden no more now than at trial to prove those things.

7    Rather, his burden here is to demonstrate that no reasonable juror informed of all the evidence

8    would find him guilty of implied-malice murder beyond a reasonable doubt.  That he has done.

9         C.   Petitioner's Lack Of Diligence Does Not Undermine The Reliability Of The Evidence

10             Of Actual Innocence

11        "Unexplained delay in presenting new evidence bears on the determination whether the

12   petitioner has made the requisite showing" of actual innocence.  McQuiggin v. Perkins, 133 S.Ct.

13   at 1935.  Timing is a factor relevant to the reliability of the newly-presented evidence, no more

14   and no less.  See id.  The petition in this case was untimely by more than five years.  For the

15   reasons that follow, the undersigned finds that the delay does not cast doubt on the reliability of

16   the evidence.

17        Petitioner has presented the following chronology of post-conviction events to explain his

18   delay.[16]  During the course of petitioner's direct appeal, petitioner's wife hired an investigator to

19   seek possible avenues for relief via habeas corpus.  The investigator conducted a single interview

20   with trial counsel and determined that he had had interviewed no witnesses, retained no expert to

21   review petitioner's medical chart, and failed to contact Dr. Yokoyama.  State Habeas Petition

22   (Lodged Doc. 9), Exh. H (letter from Jennifer Hill to Brendon Ishikawa, dated May 19, 2003).

23   Neither the investigator nor appellate counsel independently investigated the existence of

24   additional corroborating or exculpatory evidence.

25        The California Supreme Court denied review of the conviction on August 13, 2003.

26   Within two months, petitioner's wife retained Attorney Christopher Wing to pursue post-

27

28   [16] See ECF No. 11 (opposition to motion to dismiss) at 2-8; Lodged Doc. 9 (petition filed in California Supreme Court) at 35-40.

conviction relief.  State Habeas Petition (Lodged Doc. 9), Exh. M (Wing Declaration).  Mr. Wing

obtained a preserved sample of petitioner's blood taken near the time of his arrest, and discovered

that it contained Percocet and Valium.  The toxicology report prepared for Wing is dated May 10,

2004.  State Habeas Petition (Lodged Doc. 9), Exh. D.  Wing also had the shotgun evaluated by a

ballistics expert, and obtained the opinion of John Jacobsen (discussed above).  The ballistics

report is dated November 23, 2004.  State Habeas Petition (Lodged Doc. 9), Exh. G.  Wing

believed that the strength of this evidence would allow him to successfully negotiate with the

District Attorney's Office and obtain relief for petitioner without filing a habeas corpus

application.  Exh. M.  Wing first contacted D.A. Bureau Chief John O'Mara regarding the case in

May 2005.  Following several months of negotiations, Wing and O'Mara reached an impasse in

February 2006.  Id.  Wing filed a habeas petition in the Sacramento County superior court on

petitioner's behalf on November 13, 2006.  The petition was supported by the toxicology and

ballistic reports as well as by the declarations of Dr. Yokoyama, Yvonne Dixon, and Mark

Graybill.  Lodged Doc. 5.  Wing did not retain a medical or psychiatric expert.  The superior

court petition was filed two years after the expiration of the federal limitations period under

AEDPA.  The petition was denied as untimely on December 18, 2006.

Petitioner thereafter retained new counsel, who had petitioner's medical records and trial

record reviewed by a psychiatrist specializing in pharmacology.  Counsel filed a petition in the

California Court of Appeal on October 9, 2007, supported by the newly-obtained opinion of

Bruce Victor, M.D. as well as all the exhibits developed by previous counsel.  Lodged Doc. 7.

That petition was denied summarily on the merits on February 21, 2008.  Lodged Doc. 8.  An

identical petition was filed in the California Supreme Court on April 30, 2008.  It was denied

summarily on the merits on March 18, 2009.  Lodged Docs. 9, 10.  The instant petition was filed

on March 17, 2010.

The delays here are troubling.  Initial habeas counsel took no action to toll the federal

statute of limitations, permitting it to expire before any state application was filed.  Even

assuming that counsel was investigating petitioner's claims with reasonable diligence between the

finality of the conviction and filing of the first state habeas petition, that does not excuse the

24

1  failure to protect petitioner's access to federal review.  Counsel's unwarranted confidence in his

2  ability to obtain relief through negotiations also fails to justify the failure to protect his client's

3  rights.

4        When present counsel took over the case, he appears to have acted diligently in obtaining

5  Dr. Victor's expert assistance and exhausting state remedies.  Petitioner briefed timeliness in the

6  state appellate courts, and the petition was not held untimely.[17]  However, the year-long gap

7  between denial of the final state petition and filing of the federal petition is inexplicable.  The

8  statute of limitations had run before the first state petition had been filed, so the pendency of the

9  state applications had no tolling effect.  See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.

10  2003) (a state habeas corpus petition filed after the expiration of the federal statute of limitations

11  does not revive it).  Accordingly, counsel cannot reasonably have assumed that petitioner had a

12  full year to file federally following the conclusion of state court review.  Reliance on equitable

13  tolling was risky, especially given the fact that the Supreme Court had not yet held that Schlup

14  applies in the timeliness context.

15        The question before the court is not whether petitioner was dilatory, however, but whether

16  the delay in developing and presenting his evidence of innocence affects the reliability of that

17  evidence.  McQuiggin, 133 S.Ct. at 1935.  Where there is no showing that the delay prejudiced

18  the state or benefitted the petitioner, or detracts from the credibility of the proffered witnesses,

19  delay will not defeat petitioner's progress through Schlup's gateway.  See Larsen v. Soto, 730

20  F.3d 930, 941 (9th Cir. 2013).  There has been no such showing here.  The passage of time does

21  not affect the validity of the toxicology results, which were based on a preserved blood sample.

22  The passage of time does not affect the validity of the expert ballistics opinion, which was based

23  on physical evidence that – unlike memory – does not change over time.  The contents of

24  petitioner's medical records is fixed, and their reliability is unaffected by the passage of time.  Dr.

25  [17] Because the claim filed in the intermediate court of appeals and the California Supreme Court
26  was not the same as that filed in superior court -- the ineffective assistance of counsel claim was
   significantly expanded and strengthened by the inclusion of Dr. Victor's report -- it would be
27  inappropriate to "look through" the unexplained denials of the higher courts to the rationale of the
   lower court.  Cf. Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing Ylst v.
28  Nunnemaker, 501 U.S. 797, 803-804 (1991)), cert. denied, 547 U.S. 1138 (2006).

1   Yokoyama's declaration is based on those records and on his experience as petitioner's treating

2   physician.  Dr. Victor's expert psychiatric evaluation is also based primarily on review of the

3   medical records.  There is no reason to suspect that the relevant pharmacological principles or

4   scientific literature on which Dr. Victor relied have changed.  These items of evidence provide the

5   primary basis for petitioner's showing of actual innocence, and their reliability is unaffected by

6   the delay(s) in obtaining them or the delay(s) in presenting them.

7        Lay witness observations are the type of evidence most susceptible to the effects of time.

8   Yvonne Dixon and Mark Graybill executed their declarations in July 2006, approximately six

9   years after the events they recount.  The declarations bear internal indicia of reliability,[18]

10  however, and are consistent with the medical records and with Yvonne Dixon's statement to

11  police in the immediate aftermath of the shooting.  See State Habeas Petition (Lodged Doc. 9),

12  Exh. F (Statement of Yvonne Dixon, September 23, 2000).  The delay in presentation of this

13  evidence therefore does not cast doubt on its reliability.  In any case, these declarations support

14  but are not necessary to the undersigned's conclusion that petitioner has satisfied the Schlup

15  standard.

16       Although petitioner's diligence is questionable, his evidence of actual innocence is not

17  less reliable for that reason.  Accordingly, the delay does not preclude him from equitable relief

18  from the statute of limitations under Lee and McQuiggin.

19       D.  Conclusion

20       Petitioner's newly-presented evidence is neither cumulative nor speculative, nor

21  insufficient to overcome otherwise convincing proof of guilt.  See Larsen, 730 F.3d at 942.  On

22  the contrary, the evidence here is sufficient to overcome the basis for what was at best a tenuous

23  inference of implied malice.  The newly-presented evidence supports the defense theory that

24  petitioner retrieved the loaded shotgun without appreciating the danger posed by his actions, and

25  that it accidentally discharged when he stumbled without petitioner having deliberately released

26  the safety or deliberately pointed the gun at Barry O'Connell.  The evidence affirmatively proves

27

28  [18] The declarations are detailed, internally consistent, based on first-hand observations and
    intimate knowledge of petitioner.

26

1    none of this, but it is not petitioner's burden to do so.  See House, 547 U.S. at 538 (certainty as to

2    guilt or innocence not required).  When all of the evidence is considered together -- old and new,

3    incriminating and exculpatory, admissible and inadmissible -- no reasonable juror could find

4    implied malice *beyond a reasonable doubt*.  See id.

5         Respondent argues vigorously that petitioner's new evidence is not of a type or kind that

6    has supported successful Schlup claims in other cases.  Respondent points to cases involving

7    strong alibi evidence, e.g. Garcia v. Portuondo, 334 F.Supp.2d 446 (S.D.N.Y. 2004); DNA

8    evidence, e.g. House, 547 U.S. at 538-552; and evidence of third party culpability, e.g. Sawyer v.

9    Whitley, 505 U.S. 333, 340 (1992); Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1997).  These

10   are indeed cases of a different type, but Schlup and its progeny do not exclude from their reach

11   cases that turn on mental state rather than identification of a perpetrator.  Nor does Schlup require

12   that petitioner be actually innocent of any and all crimes arising from the underlying conduct.  It

13   is the crime of conviction that is in issue.  Petitioner here is attacking a conviction for implied-

14   malice murder, and straightforward application of Schlup therefore asks only whether a

15   reasonable juror could find implied malice, and thus guilt, beyond a reasonable doubt.  For the

16   reasons explained above, the undersigned answers that question in the negative.

17        Accordingly, IT IS HEREBY RECOMMENDED that:

18        1.  The previously-issued Findings and Recommendations (ECF No. 20) be vacated; and

19        2.  The motion to dismiss (ECF No. 8) be denied.

20        These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

25   objections shall be filed and served within fourteen days after service of the objections.  The

26   ////

27   ////

28   ////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 7, 2014

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE