1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FRANK DIXON,                                  No.  2:10-cv-0631 JAM AC P

12                      Petitioner,

13          v.                                      FINDINGS & RECOMMENDATIONS

14   JAMES YATES,

15                      Respondent.

16

17          Petitioner, a state prisoner proceeding with counsel, seeks a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001conviction for second-degree

19   murder, on grounds of ineffective assistance of trial counsel.  ECF No. 1.  This court has

20   previously held that petitioner's failure to file his petition within the applicable limitations period,

21   see 28 US.C. § 2244(d), was excusable on the basis of actual innocence.  ECF Nos. 35 (Findings

22   and Recommendations), 42 (Order adopting Findings and Recommendations).  Respondent has

23   since filed an answer to the petition (ECF No. 46), and petitioner has filed a reply (ECF No. 52).

24   For the reasons explained below, the undersigned now recommends that the petition be granted.

25                                       BACKGROUND

26   I.     Overview

27          The criminal case against petitioner arose from the fatal shooting of his best friend, Barry

28   O'Connell, in 2000.  It is undisputed that petitioner did not intend to kill O'Connell, and that

1

1  petitioner's shotgun had discharged unintentionally.  The question at trial, on which second

2  degree murder liability turned, was whether petitioner had acted with implied malice – that is,

3  whether his handling of the shotgun was objectively dangerous to human life, and whether he

4  acted with subjective knowledge of and conscious disregard for that danger.  The defense

5  contended that the shooting had been nothing more than a tragic accident.  Defense counsel

6  argued that the gun discharged accidentally when petitioner stumbled, and that petitioner had not

7  appreciated the danger that the loaded gun presented due to the effects of prescription painkillers.

8  Counsel presented no medical evidence to support this theory about painkillers, and presented no

9  forensic firearms evidence to support the theory that the gun could have discharged without

10 petitioner having deliberately released the safety lever.  Those omissions form the basis of

11 petitioner's ineffective assistance of counsel claim.

12     Evidence to support the defense theories regarding the gun and regarding petitioner's

13 mental state was developed for the first time after petitioner was convicted, and is presented here

14 to support petitioner's ineffective assistance claim.  The same evidence was offered in opposition

15 to respondent's motion to dismiss, to establish petitioner's factual innocence of implied-malice

16 murder and thereby escape the harsh consequences of AEDPA's statute of limitations.  In that

17 context, the court found that no reasonable juror aware of this evidence would have found

18 petitioner guilty beyond a reasonable doubt.  See McQuiggin v. Perkins, 133 S. Ct. 1924, 1928

19 (2013) (establishing standard for actual innocence as exception to statute of limitations); Lee v.

20 Lampert, 653 F.3d 929, 937 (9th Cir. 2011) (en banc) (same).

21     II.     Proceedings in the Trial Court

22     The evidence at trial established the following facts:[1]

23     Petitioner lived in Sacramento with his wife Yvonne and their three children.  Petitioner's

24 parents also lived in Sacramento, and petitioner and his wife assisted his father, Frank Sr., with

25 the care of his mother Beth, who had dementia.  Petitioner's sister France, who had previously

26

27 [1]  Because analysis of petitioner's ineffective assistance of counsel claim requires consideration
   of the totality of evidence presented both at trial and in post-conviction proceedings, Strickland v.
   Washington, 466 U.S. 668, 695 (1984), the evidence at trial is described here in some detail.

28

1   had been living in Germany, was staying temporarily with Beth and Frank Sr. while her husband,

2   who was in the army, relocated from Germany to North Carolina.  On the morning of September

3   23, 2000, a family friend named Darlene called petitioner's house and spoke to Yvonne.  Darlene

4   reported that France, France's mother-in-law, and a home health nurse had been "ganging up" on

5   Frank Sr. to convince him to move Beth from Sacramento to North Carolina.  Petitioner was

6   upset when Yvonne told him what she had learned from Darlene.

7        Yvonne testified that petitioner was not happy with the idea that his mother might be

8   permanently moved against his father's wishes.  Petitioner said that France needed to move out of

9   Beth and Frank Sr.'s home, and that they needed to speak with Frank Sr. to see if he could get her

10   moved out.  If not, petitioner told his wife, he would have to move France and her belongings out

11   of his parents' house himself.  Yvonne told petitioner, who was on medication for back pain

12   following an injury, that he could not move France's boxes because his back had been "really

13   hurting," he could not bend, and he was "going to spasm."  According to Yvonne, petitioner's

14   back pain prevented him from sitting, sleeping or walking for long.

15        Yvonne telephoned petitioner's best friend, Barry O'Connell, and had him speak with

16   petitioner about the situation.  O'Connell told Yvonne that petitioner was not making sense.  She

17   then arranged for both O'Connell and Frank Sr. to come to petitioner's house to talk.  The two

18   men arrived at the same time, around 11:25 a.m.

19        Prior to the arrival of O'Connell and Frank Sr., petitioner had spent the morning in the

20   master bedroom.  When Yvonne went in to talk to him, he was sitting on a chair in the walk-in

21   closet, trying to open his gun safe.  Petitioner was an avid gun collector.  Most of petitioner's

22   guns were kept in the safe in the closet.  Guns not in the safe, including a shotgun, were kept in

23   gun cases under piles of bags and other things in the closet.  Petitioner shared his interest in

24   firearms with O'Connell, and they frequently went shooting together.  O'Connell knew the

25   combination to petitioner's gun safe; Yvonne did not.  Petitioner asked Yvonne to have

26   O'Connell bring the combination when he came.  Yvonne tried to reach O'Connell with this

27   request, but he had already left for petitioner's house.

28   ////

After O'Connell and Frank Sr. arrived, petitioner talked with his father briefly about whether France and her things should be moved out. After the conversation, petitioner stumbled back to his bedroom and returned holding his shotgun, which was pointed up toward the ceiling. Petitioner walked toward Yvonne, O'Connell and Frank Sr. Yvonne thought petitioner was going to go out the front door, and was concerned that he might go over to France's. Yvonne moved toward the door to head him off. As she turned away from the men, she heard Frank Sr. say, "my hip, my hip," and turned back to see her father-in-law bumping into some boxes and grabbing a table to stabilize himself. She turned back toward the door again and heard a bang. Neither Yvonne nor Frank Sr. was looking at O'Connell at the time of the shot. When Yvonne turned back toward the men, all three were standing. O'Connell then fell to the ground. Petitioner did not have the gun in his hands; it had fallen to the floor. Yvonne called 911 within seconds of the gunshot.

When interviewed by the police that day, Yvonne reported that petitioner was "very upset" prior to the shooting and had walked to his room with a "mad walk" before returning with the gun. At trial, she testified that petitioner had engaged in a "regular, everyday conversation" rather than an argument, and that he had walked to his room with a stumbling gait. At the preliminary hearing, Yvonne testified that petitioner's behavior prior to the shooting had been "irrational." At trial, she testified that "illogical" was a more accurate description. She explained on cross-examination that petitioner was on a lot of medication, and that his thoughts and conversation had skipped and jumped around the whole summer.

Frank Sr. testified that Barry O'Connell was like a brother to petitioner and like a son to him. On the morning of the shooting petitioner was upset about his sister, but was not angry and was not upset at anyone at the house. When he told a detective that petitioner had been angry, it was a poor choice of words. Frank Sr. and Barry O'Connell both told petitioner to calm down, then petitioner went into the bedroom and returned with the rifle. Petitioner's right hand was on the rifle's stock and his left hand was holding the gun up. The rifle was held high and pointed toward the ceiling as petitioner approached the others. Either right before or right after he got the gun, petitioner said, "She's got to go." Petitioner was not threatening anyone. He did not shake

1  or point the gun, or say anything about hurting or scaring anyone. Petitioner had never been

2  violent.

3       As petitioner tried to pass his father in the corridor, he bumped against Frank Sr. Their

4  feet got tangled up, and Frank Sr. fell on some boxes. He heard a gunshot while he was falling.

5  He got up, turned around, and saw O'Connell standing up and then saw him fall right away.

6  Frank Sr. had not reported to the police that petitioner had had bumped into him and knocked him

7  over, or that he was facing away from O'Connell when the gun fired. He denied that he and

8  O'Connell had been standing side by side to block petitioner's passage. Petitioner was shocked,

9  panicked and upset that he had shot his best friend.

10       Dr. Gregory Reiber was the forensic pathologist who conducted the autopsy of Barry

11 O'Connell. Dr. Reiber testified that O'Connell had bled to death internally from a shotgun

12 wound to the abdomen. Shotgun pellets had penetrated several of his organs. According to Dr.

13 Reiber, O'Connell's injury was "a contact range shotgun entrance wound." By "contact," the

14 pathologist meant that "[t]he end of the [gun's] muzzle [was] touching perhaps even pressed

15 slightly against the skin." The injury was more to the front than the back side and the shotgun

16 would have been "relatively level" and "pretty close if not exactly horizontal" to the ground if

17 O'Connell were standing erect.

18       Sacramento Police Detective Keith Burgoon conducted the investigation of the crime

19 scene on September 23, 2000. Det. Burgoon described the scene and narrated a video that

20 focused primarily on the interior of the house. The house was filthy and cluttered. Det. Burgoon

21 identified various items of evidence including the gun case, the gun, the victim's T-shirt, and the

22 eight live rounds found in the shotgun at the scene. The gun case had been locked when he

23 arrived on the scene, and ammunition and weapons were kept separately in the house. There

24 were two .12-gauge shotguns in the house, as well as five rifles, a handgun and .22 caliber shells

25 in an open cabinet at the right of the front door. Numerous bottles of prescription medication,

26 including Percocet and Valium, were on the sink in the master bathroom.

27       Sacramento Police Detective John Keller interviewed petitioner following the shooting. A

28 videotape of the interview was played for the jury. At the beginning of the interview Det. Keller

falsely told petitioner that O'Connell was still alive, to keep petitioner from becoming too upset to be interviewed.  Petitioner was very emotional about the shooting, crying and covering his face with his hands.  He told Det. Keller that only O'Connell knew the combination to petitioner's gun safe, and that he was just getting the combination from him.  Many times during the interview, petitioner responded to questions by saying that he did not remember or did not know the answer. Petitioner reported that he and the victim had never fought or argued, and that the victim had come over to help mediate a matter in petitioner's family.  Petitioner said that his sister brought stress to his father's home, but also said there was no argument going on in his own house that day.  Petitioner did not argue with his father that morning and was not upset or angry.  Petitioner said that he did not remember pulling the trigger, and insisted that he would never kill Barry. Petitioner suggested the gun had discharged accidentally.  Petitioner also told Keller several times that he does not keep guns loaded, that had neither shouldered or pointed the gun, and that he did not want to threaten or hurt his sister or Barry O'Connell.  Petitioner reported that he had been taking medication for his back.  At the end of the interview, Det. Keller informed petitioner of the victim's death and petitioner became extremely distraught.  Det. Keller observed an abrasion on the web of petitioner's right hand between the thumb and index finger.  The injury was photographed.

Criminalist Faye Springer testified that the weapon that shot O'Connell was a pump action shotgun.  The magazine held eight rounds with another in the chamber.  In order for the gun to fire, the safety would have to be put into the fire position and the trigger pulled.  The safety lever was below the sight and above the trigger.  If the safety switch was slid back, the safety was on. To switch the safety off, the lever had to slide forward.  With a round in the barrel, pulling the trigger would shoot the shell.  Ms. Springer did not consider the shotgun to have a hair trigger. The shotgun had a four-pound trigger pull which was in the normal range, while a hair trigger would have a trigger pull of one pound or less.  The victim's wound occurred from "a tight contact type of shot," meaning that "the end of the shotgun was pretty much in tight contact with the victim's body even to the extent that the flesh lapped or . . . draped over the end of the shotgun . . . ."  Ms. Springer also testified on direct that the rear sight of the gun, known as a

"ghost" sight, protruded above the gun's frame and could have caused the injury to petitioner's hand as his hand slipped or slid up the gun. On cross, she opined that the weapon was oriented with the top sight toward the victim's stomach and the magazine toward the ground and in a turned position. She also agreed that a weapon fired correctly would not result in a cut to the hand. However, when asked if it were possible for a moving hand to have been cut on the ghost sight and also to have moved the adjacent safety, she did not think so because the "[s]afety is pretty stiff."

Petitioner testified on his own behalf. He told the jury that he and O'Connell had known each other since their freshman year in high school. They had been best friends ever since, were in contact every night, and O'Connell visited petitioner's home no less than once or twice a week. Petitioner and O'Connell had been collecting guns for twenty years; they each bought the same model of gun safe together. The guns that petitioner kept in his bedroom walk-in closet rather than the gun safe would not fit in the safe. Also one shotgun stayed out because it was a home defense weapon, but it was kept locked in a black case. Although petitioner generally stored his ammunition and weapons separately, the home defense shotgun was kept loaded. It had been loaded to capacity back in March; petitioner had not loaded the gun on the morning of September 23. Petitioner acknowledged that boxes of shells had been found on a table, open and uncovered, but said that they "could have been sitting there for quite a long time" amidst the substantial clutter of the house. On the day of the shooting, petitioner was taking Percocet as a painkiller, Valium as a muscle relaxant, and Indocin as an anti-inflammatory. The medications made him sleepy and resulted in a fragmented memory. He testified he was very close to his sister and had never threatened her.

At some point on the morning of the incident, petitioner thought that it would be best to move the shotgun into the gun safe. When he tried to open the safe, he could not remember the combination. Only he and O'Connell knew the combination. When he heard voices that sounded like his father's and O'Connell's, he walked out of his bedroom to get the combination from O'Connell. He brushed up against his father as he approached O'Connell, heard his father say "my hip, my hip," and saw him stumble. Petitioner testified that he lost his balance a bit and

heard a bang.  He was startled and did not know what made the sound.  He looked at O'Connell, who was standing, heard him say petitioner's name, then saw him fall over.  The shotgun was not in petitioner's hands.  Petitioner fell to his knees, put his hand under O'Connell's head, grabbed his hand, and said, "Oh, Barry."

Petitioner was unable to explain how the shotgun went from pointing upward at the ceiling to firing horizontally into O'Connell's abdomen.  He testified it probably occurred as he began to fall, although he did not go to the ground.  Petitioner agreed that if he had used the gun to push O'Connell out of the way, it would be a complete violation of basic firearms rules and an incredibly reckless act.  But he testified that he took the weapon out of the bedroom with him only to get the gun safe combination.  Although concerned and confused, he was not particularly upset or agitated that day.

On July 19, 2001, the jury found petitioner guilty of second degree murder.  CT 246.  On October 19, 2001, petitioner was sentenced to a term of 17 years to life imprisonment.  CT 305.

III.    Post-conviction Proceedings

The Third District Court of Appeal affirmed the judgment on May 15, 2003.  Lodged Doc. 2.  The California Supreme Court denied review on August 13, 2003.  Lodged Docs. 3-4.

The first of petitioner's three state habeas petitions was filed in Sacramento County Superior Court on November 13, 2006 and denied on December 18, 2006.  The second state habeas petition was filed in the California Court of Appeal, Third Appellate District, and denied on February 21, 2008.  The third petition filed in the California Supreme Court on April 30, 2008 was denied on March 18, 2009.  Lodged Docs. 5-10.

The instant federal habeas petition was filed on March 17, 2010.  ECF No. 1.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

1

2

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

4

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5    The statute applies whenever the state court has denied a federal claim on its merits,

6   whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

7   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

8   absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

9   Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

10   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

11   "The presumption may be overcome when there is reason to think some other explanation for the

12   state court's decision is more likely."  Id. at 785.

13    The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

14   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

15   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

16   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

17   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

18   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

19   what law is "clearly established" and what constitutes "unreasonable application" of that law.

20   Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

21   1057 (9th Cir. 2004).

22    A state court decision is "contrary to" clearly established federal law if the decision

23   "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

24   U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

25   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

26   the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

27   was incorrect in the view of the federal habeas court; the state court decision must be objectively

28   unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

9

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre-AEDPA standards.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  There is no single prescribed order in which these two inquiries must be conducted.  Id. at 736-37.  The AEDPA does not require the federal habeas court to adopt any one methodology.  Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

I.  Relief Is Not Barred By 28 U.S.C. § 2254(d)

A.  Petitioner's Allegations

In the single claim for relief presented to California Supreme Court and then to this court, petitioner alleges that trial counsel performed unreasonably by failing to develop and present evidence that (1) his mental state at the time of the shooting was impaired by chronic pain and the effects of prescription pain-killers, such that he did not subjectively appreciate the risk posed by his conduct, and (2) the gun was capable of firing without the safety having been intentionally released.  Petitioner alleges that counsel failed to analyze the blood sample taken from petitioner following the offense, and failed to develop and present evidence of the prescription drugs in his system at the time of the shooting.  Petitioner's wife provided a copy of petitioner's medical chart

10

1  to trial counsel, but counsel failed to contact petitioner's doctor or to consult any expert regarding

2  petitioner's medical condition, medication regime, and the impact of these factors on his mental

3  state and functioning at the time of the homicide.  Counsel also failed to consult a criminalist

4  regarding the functioning of the shotgun.  They did not seek a review of the prosecution

5  criminalist's report or an examination of the gun.

6  Petitioner alleges further that defense investigation of these matters would have developed

7  significant exculpatory evidence.  Specifically, petitioner alleges that toxicological testing of his

8  blood sample would have revealed that petitioner had oxycodone in his system when the shooting

9  occurred.  This allegation is supported by the report of toxicologist Jeffrey Zehnder.  Pet., Exh. D.

10  Petitioner's medical records (Pet., Exh. C) show that petitioner's doctor had been aggressively

11  treating him for pain since a back injury in late June of 2000.  In addition to pain and muscle

12  spasms in his back, petitioner experienced chronic pain in his knees.  The medical records

13  confirm the declaration of petitioner's wife Yvonne Dixon (Pet. Exh. B), who states that she and

14  petitioner's doctor spent months trying to determine an effective pain management regimen for

15  petitioner.  The records reflect that beginning at the end of June petitioner took Soma, Vicodin,

16  Naprocen, Loratab and Tordol, before settling on Percocet, Valium and Indocin.  Pet., Exh. C.

17  Had counsel contacted petitioner's treating physician, Donald S. Yokoyama, M.D., Dr.

18  Yokoyama would have reported that he had been treating petitioner regularly for back pain and

19  muscle spasms, and had prescribed pain killers and muscle relaxants over the course of the

20  summer of 2000 and through the time of the shooting.  Pet., Exh. A (Yokoyama Dec.).  By

21  September Dr. Yokoyama was prescribing "a very strong pain medication," Percocet 7.5, for

22  "severe pain."  He had explained to petitioner that "the medication could carry along with it

23  certain side effects including decreased level of alertness, decreased physical coordination and

24  agility and some general cognitive deficits."  Id.  Because of these side effects, petitioner was

25  unable to drive.  Petitioner took Valium at night as well as Percocet.  He reported to Dr.

26  Yokoyama that he was experiencing difficulty concentrating during the day.  Attempts to lower

27  the dosage of Percocet to improve cognition were unsuccessful due to petitioner's pain level.  On

28  September 15, 2000, a week before the shooting, Dr. Yokoyama saw petitioner at an office visit

1    and determined that the 7.5 milligram potency continued to be medically necessary.  Accordingly,

2    on September 18 Dr. Yokoyama completed insurance paperwork to justify the continued

3    prescription.  Dr. Yokoyama had deemed petitioner temporarily disabled and authorized him to be

4    off work at least until October 1, 2000.  Id.

5        Petitioner further alleges that if trial counsel had consulted a forensic psychiatrist, he

6    would have learned that the combination of pain, resulting sleep disruption, and medication side-

7    effects that petitioner was experiencing in September 2000 likely impaired his cognitive

8    functioning and would defeat a finding of implied malice.  Petitioner proffers the expert opinion

9    of Bruce S. Victor, M.D., who was retained by post-conviction counsel to review the trial record

10   and petitioner's medical records and evaluate the factors affecting petitioner's mental state at the

11   time of the shooting.  Pet., Exh. L.  Dr. Victor identifies four factors that militate against a finding

12   that petitioner knew of the danger or acted with conscious disregard of it: (1) petitioner's

13   background, and the atypical nature of his actions at the time of the shooting; (2) the impact of

14   petitioner's chronic, uncontrolled pain on his judgment and ability to recognize the possible

15   consequences of his actions; (3) the adverse cognitive side-effects of Percocet and Valium; and

16   (4) the adverse impact of chronic sleep deprivation on petitioner's judgment, social awareness

17   and impulse control.  Dr. Victor opined that at the time of the shooting, petitioner's cognitive

18   functioning was so impaired by the combination of these factors "that it is highly unlikely he

19   recognized any danger to others resulting from his handling of a weapon in their proximity, much

20   less that he consciously disregarded that danger. . ."  Id.

21       Petitioner also alleges that his wife, Yvonne Dixon, and friend, Mark Graybill, could have

22   testified about petitioner's impaired physical and mental functioning, and provided the jury with

23   multiple examples of petitioner's physical clumsiness and increasing cognitive impairment during

24   the months  leading up to the shooting.  Pet., Exhs. B, E.  This evidence would have supported the

25   defense accident theory, and was inconsistent with implied malice.

26       Finally, petitioner alleges that consultation with a firearms expert would have developed

27   evidence consistent with the defense's accident theory and inconsistent with the prosecution

28   theory of the shooting.  Petitioner presents the report of a firearms analyst, John Jacobson, who

examined the shotgun and reviewed Criminalist Faye Springer's report.  Exh. G.  Contrary to

Springer's findings, Jacobson concludes (1) that the injury to the base of petitioner's right thumb

was caused by collision with the safety switch, and (2) that the safety could be switched off by a

hand forcibly sliding over it.  Jacobson determined that the location of the injury on petitioner's

hand is more consistent with the location of the safety switch than that of the rear gun sight.

Jacobson also simulated the incident by dabbing fingerprint powder on the safety lever, holding

the gun by its grip, and forcing the muzzle into a hard surface.  The impact forced his hand over

the safety switch, moving it into the fire position and leaving a mark in the same location on

Jacobson's gloved hand as the injury to petitioner's hand.  Photographic comparison of

petitioner's injured hand and the powder impression left on Jacobson's hand by the simulation

demonstrate a close similarity of both location and impact pattern.  The results of Jacobson's

simulation contradict Springer's testimony that the safety switch could not be moved into the fire

position by a hand sliding over it accidentally.

Petitioner contends that if the jury had been presented with this body of evidence, there is

a reasonable likelihood of a different verdict.

### B.  The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a

petitioner must show (1) that counsel's representation fell below an objective standard of

reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

Washington, 466 U.S. 668, 692, 694 (1984).

The proper measure of attorney performance is objective reasonableness under prevailing

professional norms.  Id. at 688.  Counsel's strategic choices are generally accorded deference, but

only if those decisions are themselves reasonable and are based on reasonable investigations,

research, and judgments.  Id. at 690-91; see also Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir.

1997) (strategic choices are not immune from challenge under Strickland, they must be

reasonable).  "[C]ourts may not indulge 'post hoc rationalization' for counsel's decisionmaking

that contradicts the available evidence of counsel's actions."  Harrington v. Richter, 131 S.Ct. at

790 (quoting Wiggins v. Smith, 539 U.S. 510, 526-27 (2003)).

Prejudice means that the error actually had an adverse effect on the defense and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 693-94.  A "reasonable probability" is less than a preponderance.  Kyles v. Whitley, 514 U.S. 419, 434 (1995); Strickland, 466 U.S. at 693 (petitioner need not "show that counsel's deficient conduct more likely than not altered the outcome in the case").  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  In assessing prejudice from deficient performance, the court must consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced at trial and in post-conviction proceedings.  Id. at 695; Wiggins, 539 U.S. at 536; Williams v. Taylor, 529 U.S. 362, 397 (2000).

C.  The State Court's Ruling

The California Supreme Court denied petitioner's ineffective assistance claim summarily, without comment or citation.  Lodged Doc. 10.  In conducting the review required by § 2254(d), this court therefore must ask whether the state court's result could constitute a reasonable application of Strickland.  See Harrington v. Richter, 131 S. Ct. at 786.  The Richter standard applies notwithstanding the superior court's reasoned rejection of a previous version of petitioner's ineffective assistance of counsel claim, for the reasons now explained.

A federal habeas court will "look through" a silent state court denial to the last reasoned state court decision rejecting the same claim, if such a decision exists, and subject the underlying decision to § 2254(d) scrutiny.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (establishing the "look through" presumption); Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005), cert. denied, 547 U.S. 1138 (2006) (applying "look through" presumption in context of § 2254(d) review).  In the instant case, prior to the California Supreme Court's consideration of the matter, the California Court of Appeal had also denied petitioner's claim without a reasoned decision.  Lodged Doc. 8.  The Sacramento County Superior Court had still earlier rejected a similar but distinct ineffective assistance of counsel claim, which was not supported by the mental health evidence subsequently developed by present counsel, exhausted in the state supreme court, and presented here.  See Lodged Docs. 5, 6.  As this court has previously found, ECF No. 35 at 25

14

1   n.17,[2] the "look through" presumption does not apply to this situation because the claim rejected

2   by the superior court was not the same claim that was presented to and rejected by the California

3   Supreme Court, and subsequently presented to this court.

4        The medical evidence included in the expanded claim, specifically Dr. Victor's expert

5   opinion, significantly broadened the scope of petitioner's ineffective assistance of counsel claim.

6   The claim previously presented to the superior court, had it been pursued to the state's highest

7   court, would not have served to exhaust the claim presented here, which is predicated in

8   substantial part on that evidence.  See Vasquez v. Hillery, 474 U.S. 254, 260 (1986) (claim not

9   fairly presented to state court, as required by exhaustion doctrine, if additional facts alleged in

10  federal court fundamentally alter the nature of the claim).  Because the medical evidence put the

11  claim in a significantly different and stronger evidentiary posture, petitioner needed to present

12  that evidence to the state's highest court in order to exhaust his claim.  See Aiken v. Spaudling,

13  841 F.2d 881 (9th Cir. 1988).  He did so.

14       It is the exhausted claim that must be reviewed under § 2254(d), in light of the evidentiary

15  record as it existed at the time of exhaustion.  See Cullen v. Pinholster, 131 S. Ct. at 1399.  When

16  the same allegations and evidence exhausted in a state's highest court have previously been

17  reviewed by a lower court, it makes eminent sense to interpret a silent denial as endorsement of

18  the lower court's ruling.  See Avila v. Galaza, 297 F.3d 911, 917-18 & n. 6 (9th Cir. 2002), cert.

19  denied, 538 U.S. 919 (2003).  When the lower court was not reviewing the same allegations and

20  evidence, however, the logic of the "look through" presumption does not apply.  Because AEDPA

21  review applies to "a single state court decision, not to some amalgamation of multiple state court

22  decisions," Barker, 423 F.3d at 1093, this court must focus exclusively on what the California

23  Supreme Court did in light of what it knew.  Pinholster, 131 S. Ct. at 1399.  Accordingly,

24  AEDPA review proceeds on the basis of the California Supreme Court's "postcard denial."  See

25  Richter, 131 S. Ct. at 786.

26

27  [2]  Findings and Recommendations filed Jan. 8, 2014, adopted by Order filed June 11, 2014 (ECF
    No. 42).

28

1  Under California law, a summary merits denial means that the California Supreme Court

2  assumed the truth of all factual allegations asserted in support of the claim, and nonetheless

3  concluded that those facts did not state a claim entitling the petitioner to relief.  People v. Duvall,

4  9 Cal. 4th 464, 474 (1995); People v. Romero, 8 Cal. 4th 728, 737 (1994).  In other words,

5  summary denial on the merits indicates a determination that the petitioner has failed to state a

6  prima facie case.  Duvall, 9 Cal. 4th at 475; Pinholster, 131 S. Ct. at 1402 n.12 (citing In re Clark,

7  5 Cal. 4th 750, 770 (1993)).  When a state court denies a claim for failing to state a prima facie

8  case, the absence of a prima facie case is the determination that must be reviewed for

9  reasonableness under § 2254(d).  Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003), cert.

10  denied, 543 U.S. 1038 (2004).

11  D.  Objective Reasonableness Under § 2254(d)

12  The record before the California Supreme Court included all the allegations and evidence

13  that this court has previously found, in the context of the actual innocence exception to the statute

14  of limitations, would have prevented *any* reasonable juror from finding implied malice.  See ECF

15  Nos. 35, 42.  It was objectively unreasonable of the California Supreme Court to conclude that

16  these allegations and evidence failed to state a prima facie case of ineffective assistance.  See

17  ECF 53 (ordering evidentiary hearing) at 8-10.[3]

18  The petition before the state court contained allegations more than sufficient, if proved, to

19  establish both unreasonable performance and prejudice within the meaning of Strickland.

20  Specifically, petitioner alleged that counsel was on notice of evidence that could support his

21  accident defense and negate any inference of implied malice, but failed to investigate and develop

22  that evidence.  Petitioner presented post-conviction evidence that his wife had given counsel the

23  names of percipient witnesses with information about petitioner's functioning, but that these

24  witnesses were not contacted.  Petitioner presented evidence that his wife had given trial counsel

---

25  [3]  The undersigned has previously expressed the view that § 2254(d) did not bar relief or pose an
26  impediment to an evidentiary hearing in this case.  ECF No. 53.  Although respondent did not
seek reconsideration of that order by the district judge, the undersigned had explicitly stated that
27  the § 2254(d) analysis would be repeated in Findings and Recommendations on the merits.  Id. at
10, n. 3.  Accordingly, respondent remains free to object to the § 2254(d) analysis reprised here.

28

a copy of petitioner's medical file, but that counsel never contacted petitioner's treating physician to follow up.  The trial record establishes that counsel argued in general terms that petitioner was impaired, but offered no medical records or medical testimony to support that claim or to explain how petitioner's pain and medications affected his cognitive functioning.  Counsel's failure to present exculpatory toxicology evidence, medical expert testimony, and an alternative firearms expert are indisputable from the trial record, and the petition alleges a complete failure to investigate these matters.  See Lodged Doc. 8 (State Habeas Petition) at 23 (counsel did not contact treating physician), 24 (counsel did not retain forensic psychiatrist), 26 (counsel did not have blood sample analyzed), 28 (counsel did not contact witnesses), 32 (counsel did not consult independent firearms expert).

Assuming the truth of these allegations, such failure to investigate plainly constitutes deficient performance.  Counsel's presumably strategic decision not to pursue a certain line of defense or present certain evidence is entitled to deference as reasonable only to the extent that it is supported by reasonable investigation.  See Strickland, 466 U.S. at 690-91; Jones v. Wood, 114 F.3d at 1010.  Petitioner's subjective appreciation of the dangerousness of his conduct was the issue on which this case turned.  See People v. Knoller, 41 Cal. 4th 139, 143 (2007) ("In short, implied malice requires an awareness of engaging in conduct that endangers the life of another – no more, no less.").  Contrary to respondent's answering argument in this court,[4] evidence of impaired metal state would not have been inconsistent with the accident theory pursued at trial.  Evidence that petitioner was both physically and cognitively impaired by pain, sleep deprivation and medication would have made it *both* more likely that he stumbled and caused an accidental discharge *and* less likely that he was subjectively aware his handling of the gun was life-threatening.  The capacity of the gun to fire without a deliberate release of the safety was also relevant both to accident and to subjective appreciation of risk.  Accordingly, petitioner's allegations of a complete failure to investigate the existence and strength of exculpatory evidence

---

[4]  Because the petition was denied summarily, respondent was never held to answer or required to brief the claim in the California Supreme Court.

1    readily establish a prima facie case of deficient performance.  See Evans v. Lewis, 855 F.2d 631

2    (9th Cir. 1988) (finding deficient performance where counsel failed to review available

3    documents); Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (finding deficient performance

4    where counsel failed to investigate mental state issues), cert. denied, 539 U.S. 958 (2003).

5         Petitioner supported his prejudice allegations with a substantial body of evidence: the

6    declarations of his treating physician, a retained mental health expert, percipient witnesses, and a

7    forensic firearms expert.  That evidence not only establishes a reasonable likelihood of a different

8    result as required for relief under Strickland, it has previously been found to meet the

9    significantly higher standard applicable to the actual innocence exception to the statute of

10   limitations. As this court held in denying the motion to dismiss, no rational juror could find

11   implied malice in light of all the evidence presented in relation to the habeas petition.  ECF Nos.

12   35, 42.  That ruling is the law of the case.  See Thomas v. Bible, 983 F.2d 152, 154 (9th Cir.),

13   cert. denied, 508 U.S. 951 (1993).  Given the strength of petitioner's proffered exculpatory

14   evidence, it cannot have been objectively reasonable for the state court to conclude that petitioner

15   had not even stated a prima facie case.

16        For all these reasons, summary dismissal was objectively unreasonable whether it was

17   based on the sufficiency of petitioner's performance allegations or on the sufficiency of the

18   prejudice proffer.  Accordingly, § 2254(d) (1) does not bar relief and petitioner's claim is subject

19   to de novo review.  See Panetti v. Quarterman, 551 U.S. 930, 925 (2007) (when § 2254(d) is

20   satisfied, the federal habeas court resolves the claim "without the deference AEDPA otherwise

21   requires"); Frantz v. Hazey, 533 F.3d at 737 (when § 2254(d) (1) is satisfied, the federal habeas

22   court conducts de novo review of constitutional claim).

23        II.    Findings of Fact

24        Having concluded that § 2254(d) does not bar relief, see ECF No. 53, the undersigned

25   conducted an evidentiary hearing in this matter on August 3 and 5, 2015.[5]  Petitioner called the

26   _____

27   [5]  28 U.S.C. § 2254(e)(2), which limits the availability of evidentiary hearings in federal court,
     does not apply here.  Subsection (e)(2) bars a hearing only where the failure to develop the facts
     in state court is attributable to petitioner's lack of diligence.  Williams v. Taylor, 529 U.S. at 432.

28   (continued…)

18

1   following witnesses: Donald S. Yokyama, M.D., petitioner's treating physician at the time of the

2   homicide; Celia Hartnett, forensic science consultant; Jeffrey L. Zehnder, forensic toxicologist;

3   Bruce S. Victor, M.D., forensic psychiatrist; Mark Graybill, a close friend of petitioner; Yvonne

4   Dixon, petitioner's wife; and petitioner Frank Dixon.  Respondent called the following witnesses:

5   petitioner's trial counsel Kenneth L. Rosenfeld and Russell W. Miller, Jr.  Trial counsel's case

6   file (hereafter, "Trial File") was accepted into evidence by stipulation.  Both parties introduced

7   additional documentary evidence, and petitioner produced the shotgun for examination by witness

8   Hartnett and by the court.

9        Having considered the testimony and exhibits presented at the hearing, and the record as a

10   whole, the court makes the following findings of fact.

11        A.  <u>Counsel's Performance</u>

12        The shooting took place on September 23, 2000.  Petitioner's wife, father, and friend

13   Mark Graybill promptly set out to secure counsel for petitioner.  Attorney Russell Miller was

14   retained, with petitioner's father paying the $25,000 fee.  Evidentiary Hearing Transcript ("EH")

15   2 at 7 (testimony of Yvonne Dixon).[6]  At the time he was retained in this matter, Miller had been

16   practicing law for less than four years and had never tried a murder case.  EH 2 at 89 (testimony

17   of Russell Miller).  Kenneth Rosenfeld, who was of counsel to the Miller Law Group, had been a

18   criminal defense lawyer for approximately three years, EH 2 at 51 (testimony of Kenneth

19   Rosenfeld) (practicing since 1998).  He did not recall whether he had previously tried a murder

20   case.  EH 2 at 53.

21   ////

22   Here, the California Supreme Court summarily denied petitioner's claim despite his extensive
23   proffer, thus foreclosing the possibility of further factual development.  Petitioner's state court
      proffer reflects his diligence in that court.  The state court's summary denial was unreasonable for
24   the reasons explained above.  Because the court, and not petitioner, was responsible for the failure
      to develop the facts, § 2254(e)(2) does not bar an evidentiary hearing in this court.  <u>See</u> <u>Horton v.</u>
25   <u>Mayle</u>, 408 F.3d 570, 582 n.6 (9th Cir. 2005) (where a state court summarily rejects a prisoner's
      claims prior to the time at which a hearing can be requested under state law, the failure to develop
26   facts at a hearing may not be attributed to the prisoner for purposes of § (e)(2)).

27   [6]  The evidentiary hearing transcript is in two volumes, designated here as "EH 1" and "EH 2"
      and found at ECF Nos. 78 and 79.

28

1          1.  Investigation and Litigation of Medical and Related Mental State Issues

2          Counsel were aware from the outset that petitioner had been taking pain medication at the

3   time of the shooting.  Both petitioner and his wife told the lawyers so.  Police reports provided in

4   discovery noted that vials of medication prescribed to petitioner, including Percocet (a

5   combination of the opiate oxycodone and acetaminophen), had been found in petitioner's

6   bathroom.  Trial File at 23, 44.  Petitioner told the police that he had taken Valium (diazepam)

7   and Percocet (oxycodone) within 24 hours of the shooting.  See, e.g., Trial File at 12 (police

8   report re petitioner's booking statement), 190, 196-98 (transcript of Frank Dixon interview).

9   Yvonne Dixon told the police that petitioner's pain and pain medications had been negatively

10   affecting him recently.  Trial File at 253-55 (transcript of Yvonne Dixon interview).

11          Discovery included a December 28, 2000 report from the Sacramento County Forensic

12   Laboratory, which indicated that a blood sample taken from petitioner shortly after arrest had

13   tested positive for diazepam and its metabolite nordiazepam.  Trial File at 145.  The test did not

14   detect other drugs, including opiates, despite the fact that petitioner was taking Percocet.  The

15   trial file does not reflect that counsel discussed this report with the county lab analyst, or sought

16   further analysis of the blood sample.  Neither lawyer testified that any attempt was made to

17   determine the nature of the testing that had been performed by the county lab.  Based on the

18   evidentiary record as a whole, it is clear that counsel made no attempt to determine whether the

19   "negative" tests for opiates and other classes of substances had been crude screening tests or

20   sensitive drug detection analyses.

21          Following the preliminary examination, trial was set for March 5, 2001.  CT 2.  That date

22   was subsequently continued to May 10, 2001.  CT 3.[7]  On April 22, 2001, approximately seven

23   months after he was retained and three weeks before the scheduled trial date, Miller wrote to

24   petitioner in relevant part as follows:

25   ////

26

27   _____
    [7]  On May 10, trial was reset for June 7.  CT 7.  At that time trial was rest a final time, for July 9,
    2001.  CT 8.
28

**Re:     Your upcoming Jury Trial**

Dear Frank;

Hope everything has been going well to date.  Your jury trial is set for 10 May this year. . . .

There are several issues we need to coordinate for necessary trial preparation.

Please go to the doctor that prescribed the medication that you had taken the day of the incident.  I will need your complete medical file from that doctor no later than 30 April.  I will also need you [sic] medical records from any attending doctor from the date of incident to date. . . .   Your medical records should be easily recovered by yourself. . . .

Please contact [my office manager] for a meeting between yourself, my investigator and I in the next week.  We will discuss our theory of the case.  As well, we will discuss the themes included in our theory and our manner and method of presenting such evidence.

If you have a "favorite" pharmacist or physician who would be willing to support our theory of the case regarding your medication, please inform me within the week.  If not, I will retain the services of a pharmacological expert witness for your defense. . . .

Trial File at 761.

This letter contains the only reference to expert services in counsel's file.

Petitioner's wife obtained his medical records from his treating and prescribing physician, Dr. Yokoyama, on or about May 1, 2001, and provided them to counsel.  Trial File at 281 (release dated May 1, 2001), 282-305 (medical records); EH 2 at 8 (testimony of Yvonne Dixon). Significant portions of these records, including the doctor's clinical notes, are effectively illegible.  At the hearing, counsel were able to decipher only parts of the records, excluding the clinical notes.  EH 2 at 57-61 (testimony of Kenneth Rosenfeld); EH 2 at 93-95 (testimony of Russell Miller).  It is nonetheless clear from the Yokoyama records that petitioner was seen for pain six times in the three months immediately preceding the homicide.  During that period petitioner had been prescribed a changing roster of medications including, in various combinations, Vicodin, Soma, Ibuprofen, Naprosyn, Indocin, Loratab, Toradol, Percocet, and Valium.  Trial File at 287-292.  The sheer number of drugs tried, and the frequency of changes to the medication regime, corroborated Yvonne Dixon's report that it had been difficult to find an

21

1   effective pain management protocol, and that certain drugs had been discontinued due to side

2   effects.  Trial counsel never contacted Dr. Yokoyama, either for interpretation of his illegible

3   clinical notes or for additional information regarding petitioner's condition and medications.  EH

4   1 at 21 (testimony of Dr. Yokoyama); EH 2 at 95 (testimony of Russell Miller).  Neither did

5   counsel retain an expert to review and interpret Dr. Yokoyama's records.  EH 2 at 95.

6          On the same date he wrote to petitioner requesting medical records, April 22, 2001,

7   Miller looked up diazepam on the Internet and printed out a 5-page drug information entry from

8   www.mentalhealth.com.  Trial File at 306-310.  The article stated that "the most common adverse

9   effects reported are drowsiness and ataxia."[8]  Id. at 308.  Other specified side-effects were

10   dizziness, confusion, and hyper-excitement.  Id.  This article constitutes the only research or

11   investigation into pharmacological issues that is documented in trial counsel's file.  At the

12   hearing, Miller characterized his web browsing as "research" of "medical sources."  EH 2 at 80.

13   Miler did not follow up by asking petitioner's treating physician whether petitioner had

14   experienced drowsiness, ataxia, or other known side-effects of diazepam, or by consulting an

15   expert on the possible interactions between diazepam and petitioner's other medications.

16          Kenneth Rosenfeld testified that he made a cold call to a CVS drugstore, then went to the

17   store to talk to the pharmacist about the effects of Valium and oxycodone.  EH 2 at 55, 65.

18   Rosenfeld met with the pharmacist, reported petitioner's medications and dosages and petitioner's

19   height and weight, and asked "how would this have impaired motor functions."  EH 2 at 62.

20   Although Rosenfeld did not recall his precise "operative question" – and the record contains no

21   formal request for an opinion on any specific question – he recalled that "[t]he tenor of the answer

22   was that the medications and dosage, given the size of the person, in their opinion would not have

23   had the impact that I had asked if it would have had for defense purposes."  EH 2 at 62-62.[9]  The

24   _____

25   [8]  "Ataxia" is the lack of muscle control during voluntary movements such as walking or picking
    up objects.  See http://www.mayoclinic.org/diseases-conditions/ataxia/basics/definition/con-

26   20030428, visited by the court on March 24, 2016.
    [9]  Roseneld also summarized the opinion this way: that the medications and dosages that

27   petitioner took, in a man of petitioner's size, would not "make them have lost consciousness, or
    memory, or impairment to the degree that they would not be able to formulate the thought to go

28   (continued…)

1    trial file contains no notes of this meeting or other documentation of any consultation with a

2    pharmacist.  Rosenfeld could not remember, and the file does not reflect, whether the pharmacist

3    had any relevant forensic expertise.  EH 2 at 63-64.

4        Rosenfeld testified that he also spoke to Jeff Zehnder, or perhaps another toxicologist at

5    Drug Detection Laboratories, about the case.  Rosenfeld was not sure who he spoke to at the lab.

6    He was familiar with Mr. Zehnder from many other cases.  The conversation was "informal," and

7    Rosenfeld did not mention petitioner's name but "just gave a description of what medications and

8    what effects they would have."  EH 2 at 44.  Jeffrey Zehnder has no memory of being contacted

9    by Rosenfeld about this case.  EH 1 at 90-92 (testimony of Jeffrey Zender).  The trial file contains

10   no note or memo documenting a call from Rosenfeld to Zehnder.  At the hearing, Rosenfeld could

11   not reliably distinguish this purported conversation from the one with the CVS pharmacist.  EH 2

12   at 45.  The court finds that Rosenfeld's vague and uncorroborated testimony on this point is

13   insufficient to establish that he in fact consulted a toxicologist at Drug Detection Laboratories in

14   relation to petitioner's case.

15        Neither Miller nor Rosenfeld could identify any other investigative steps that were taken

16   regarding petitioner's medical condition or medications.  The trial file is completely devoid of

17   defense investigation reports or other documentation of investigative efforts regarding mental

18   state and intent issues.  The court finds that the only efforts made in this regard were: (1) Miller's

19   request that petitioner obtain his own medical records, which counsel were in significant part

20   unable to decipher; (2) Miller's cursory internet research into diazepam, and review of a single

21   drug information article; and (3) Rosenfeld's informal conversation with a CVS pharmacist.

22   Counsel never consulted with a medical doctor or mental health expert, and never sought an

23   expert opinion from a pharmacologist or similar expert that included review of available medical

24   history information.

25

26 ——————————————————————————————

27 ahead and do what happened."  EH 2 at 45, ECF No. 79 at 47.  This statement reflects a
fundamental misunderstanding of both the intent necessary for implied malice and the potential
mental state defense that was available in this case.

28

1    Counsel concluded from Miller's online research and Rosenfeld's conversation with the

2    CVS pharmacist that expert testimony would not be useful.  EH 2 at 95-96, 105 (testimony of

3    Russell Miller).

4    Counsel conducted no interviews with any of petitioner's friends who had observed

5    petitioner over the course of the weeks leading up to the shooting, and who could compare

6    petitioner's functioning at that time with his functioning prior to the back injury he sustained on

7    June 28, 2000.  Yvonne Dixon gave Miller contact information for Mark Graybill, a long-term

8    friend who had spent time with petitioner shortly before the homicide.  EH 2 at 11-12 (testimony

9    of Yvonne Dixon).  Counsel did not pursue lay witnesses regarding Mr. Dixon's functioning

10   because (1) they did not think it was relevant, and (2) they intended to rely on petitioner's own

11   testimony about his condition.  EH 2 at 100, 102 (testimony of Russell Miller).[10]

12   At trial, counsel elicited testimony from petitioner about his June 2000 back injury and its

13   consequences, RT 389, and about his medication regime at the time of the shooting, RT 395.

14   These facts were argued to the jury in a cursory fashion.  RT 583 (reference to "injured back"),

15   595 (arguing that ". . . he's been on some medication that would affect his agility. . .").  No

16   medical evidence was presented to corroborate petitioner's testimony or to provide a basis for

17   findings regarding petitioner's physical and cognitive functioning.

18   2.   Investigation and Litigation of Firearms Issues

19   County criminalist Faye Springer's report was dated May 18, 2001.  Trial File at 167-169.

20   As previously described, Springer reported that petitioner's shotgun – specifically including its

21   safety lever – functioned normally.  Springer also opined that the injury to the webbing between

22   petitioner's right thumb and forefinger could have been caused by his hand hitting the gun's

23   protruding rear sight, or "ghost sight."  Id. at 168-169.

24

---

25   [10]  The court does not address petitioner's allegation that counsel were ineffective in failing to develop and present more detailed testimony from Yvonne Dixon regarding petitioner's

26   impairments.  Even if this omission was unreasonable, it was not prejudicial.  Because petitioner's other evidence establishes a Strickland violation without considering the likely effect

27   of more detailed testimony from petitioner's wife, the matter has no effect on the outcome in habeas.

28

Defense counsel did not question Springer about her report prior to trial, and did not consult a firearms expert to review Springer's report or to examine the shotgun. They did not seek an expert opinion, independent of Springer's, regarding the cause of the injury to petitioner's hand. More specifically, they did not seek an expert opinion whether the safety switch could have been inadvertently moved to the "fire" position when petitioner stumbled.[11] Because petitioner was indisputably familiar with basic firearms safety rules, it was entirely predictable that whether the safety switch had been moved into the "fire" position deliberately or accidentally would be a key issue at trial.

Springer testified at trial that the injury to petitioner's hand was probably caused by collision with the ghost sight. RT 103. When Rosenfeld asked on cross-examination whether the same hand movement could have accidentally moved the adjacent safety switch to the "fire" position, Springer rejected that possibility.

> Q: So if the hand moved, it's possible it could have moved the safety and also cut itself on the ghost sight?
>
> A: Safety is pretty stiff, so I don't think you could have moved the safety without – with just a hand sliding up. 'Cuz if you move it, you'll see it's very stiff to move.
>
> Q: But it's not an impossibility?
>
> A: I don't think you can move it that way.

RT 107.

No rebuttal witness was presented.

B.  The Evidence That Trial Counsel Failed To Develop and Present

1.  Mental State Evidence

A.  Treating Physician Donald Yokoyama, M.D.

Had Dr. Yokoyama been called to testify for the defense, he would have told the jury that

---

[11] Rosenfeld testified that he would have deferred to Miller's judgment on this issue, in light of Miller's military experience and "very high functioning knowledge of weapons." EH 2 at 73. Miller testified affirmatively that he did not contact a firearms examiner. EH 2 at 98. He did not recall whether he had a tactical reason. EH 2 at 99.

he had been petitioner's physician since 1990.  EH 1 at 9.  Dr. Yokoyama had treated petitioner

for two moderate back injuries during the 1990s, both of which resolved without complication.

Petitioner's June 28, 2000 injury was much more severe.  EH 1 at 10-15.  Petitioner was initially

prescribed Motrin, Soma and Vicodin, but his wife reported on July 6 that the Motrin and Vicodin

were ineffective in relieving his pain and that the Soma was "knocking him out."  EH 1 at 13.

Petitioner was seen in the urgent care clinic on July 12 for continuing back pain. Dr. Yokoyama

switched him from Vicodin to the stronger Lortab, and from ibuprofen to Naprosyn.  EH 1 at 13-

14.  Ten days later, Mrs. Dixon called to say that petitioner was "still having trouble, was unable

to sit down for 15 minutes."  Dr. Yokoyama saw petitioner the next day.  EH 1 at 14.  Later that

month, he prescribed Percocet because "the medications [petitioner] was using weren't effective."

The dose was increased on August 2 because the lower dose was not providing enough relief.  EH

1 at 15.  Because petitioner subsequently complained that the Percocet was causing difficulties

with concentration, Dr. Yokoyama reduced the dose to its original level.  EH 1 at 17.  The lower

level failed to provide adequate pain relief, however, so it was increased again on August 24.  EH

1 at 19.

On August 23, Dr. Yokoyama certified that petitioner was unable to work due to the

severity of his pain.  At that time, Dr. Yokoyama estimated that petitioner would be able to return

to work on October 1.  EH 1 at 18; Pet. Ex. 6 at 222.

Dr. Yokoyama saw petitioner on September 15, eight days before the homicide.  On that

date petitioner was experiencing pain on the "higher side" of the spectrum of patients with back

injuries.  EH 1 at 19.  On September 18, Dr. Yokoyama signed an insurance form authorizing the

higher dose of Percocet.  The form required physician certification that other medications had

been tried and had failed to provide adequate relief.  EH 1 at 20; Pet. Ex. 6 at 238.

Dr. Yokoyama testified that it is a challenge for a physician to prescribe at a level that

provides pain relief without excessive side effects.  EH 1 at 29.  The common side effects of

petitioner's medications included drowsiness and fatigue, and impaired balance, judgment, and

coordination.  EH 1 at 16, 25.  The side effects of chronic pain itself include depression,

grumpiness, and sleep disruption.  EH 1 at 30.  Petitioner complained at various times of impaired

1  concentration, drowsiness, difficulty sleeping, and continuing pain.  EH 1 at 17, 26, 30.

2  Petitioner did not engage in "medication seeking behavior."  EH 1 at 17.

3          Dr. Yokoyama was a fully credible witness.

4                  B.  Lay Witness Mark Graybill

5          Mark Graybill is an aerospace engineer who met petitioner through a mutual friend and

6  fellow aviation enthusiast.  For approximately ten years prior to the homicide, Graybill and

7  petitioner were good friends who shared their interests in aviation and video gaming and who

8  socialized with each other's families.  Barry O'Connell frequently joined them for multi-player

9  video games and for target shooting.  EH 1 at 165-167.

10         Although plaintiff's mobility prior to his June 2000 back injury was somewhat affected by

11  obesity and chronic knee problems, he was always steady on his feet and had "very, very good

12  physical control and a very precise way of moving around."  EH 1 at 167-168.  After the June

13  2000 back injury, "his mobility got to be a lot worse" and "his movements got to be a lot looser, a

14  lot less precise."  EH 1 at 168.  The friends' activities were affected by petitioner's limitations, as

15  petitioner could not drive and had difficulty walking around.  Graybill recounted specific

16  observations of petitioner's increasing instability on his feet, and his deteriorating manual

17  dexterity.  EH 1 at 168-171.  Graybill also gave examples of marked changes in petitioner's

18  cognitive functioning.  EH 1 at 172 ("[H]e had a hard time remember things from short term, or

19  of keeping complex things in his head at all.  It wasn't really possible to talk to Frank in the way I

20  was normally able to talk to him because he just wouldn't be able to be clear on the subjects we

21  were discussing at the time.")

22         In mid-September 2000, Graybill took petitioner to the Reno Air Race qualifying races.

23  Graybill planned the excursion to accommodate petitioner's compromised condition.  Graybill

24  vividly described petitioner's obvious physical pain and his inability to hold the thread of a

25  conversation.  EH 1 at 172-175.  Petitioner was severely impaired in comparison to his normal

26  functioning.  EH 1 at 176.

27         Graybill was a fully credible witness: well-spoken, thoughtful, and unimpeached.

28  ////

27

C. Forensic Toxicologist Jeffrey Zehnder

Jeffrey L. Zehnder is a forensic toxicologist and principal in Drug Detection Laboratories. He testified as a qualified expert in his field.  EH 1 at 79, 84.  In 2004, Zehnder tested the blood sample taken from petitioner on September 23, 2000, which had previously been tested only by the Sacramento County crime lab.  Using the gas chromatography mass spectrometry (GC/MS) method, Zehnder identified the presence of oxycodone at 0.018 micrograms per milliliter.  EH 1 at 79-80.

Zehnder reviewed the Sacramento County crime lab report dated December 28, 2000. Zehnder testified that the county lab uses an immuno-assay technique as a screening tool.  If the level of a drug is below the specified cut-off, the result comes back "negative" despite the presence of the substance.  The fact that the county lab report specified a negative result for opiates therefore does not mean that petitioner's blood had no detectible level of opiates.  EH 1 at 82. GC/MS is a more sensitive and accurate, and more expensive, test than the screening test conducted by the county lab.  EH 1 at 82-83.

Given the time of the homicide, the time of the blood draw, and oxycodone's known rate of dissipation through metabolism, Zehnder estimated that the likely level of oxycodone in petitioner's blood at the time of the homicide was between .04 and .05 micrograms per milliliter. This is in the middle of the therapeutic dose range.  EH 1 at 87-88.

The court finds Zehnder's testimony, including his opinion as to the likely level of oxycodone (Percocet) at the time of the homicide, to be credible.

D. Forensic Psychiatrist Bruce Victor, M.D.

Bruce Victor, M.D., was qualified as an expert forensic psychiatrist.  EH 1 at 98.  Dr. Victor reviewed petitioner's medical records and excerpts of the trial transcript (specifically, the testimony of petitioner, his father, and his wife).  Dr. Victor discussed petitioner's medical records with Dr. Yokoyama, because legibility problems would otherwise have made it impossible for him to have a full comprehension of Dr. Yokoyama's course of treatment.  Dr. Victor also interviewed petitioner's wife, and conducted a clinical interview of petitioner

////

in which he took a psychiatric history, a medical history, and a social history.  EH 1 at 98-100.[12]

Dr. Victor elaborated on the opinion expressed in his 2007 declaration, that petitioner's cognitive functioning was so impaired on the date of the shooting by the combination of chronic pain, medication side-effects, and sleep deprivation that he likely failed to recognize the danger posed by his actions.  By way of background, Dr. Victor identified numerous factors supporting a conclusion that petitioner's behavior on the date of the shooting was aberrant for him.  "Pertinent negatives" include petitioner's lack of prior treatment for any behavioral problem, mood or anxiety disorder; petitioner's history, prior to the back injury in June of 2000, of avoiding analgesic medications; and the absence of any history of impulsivity, violence, or substance abuse.  EH 1 100-101.  "Pertinent positives" include ongoing and stable family relationships; a history of rule-following, including career choices reflecting a concern with rules per se; and a history of rule-following specifically related to the handling of firearms and managing disagreements.  EH 1 101-102.  This history led Dr. Victor to a conclusion that petitioner's mental functioning was normal prior to his June 2000 back injury.  EH 1 at 104 ("there was no disturbance as far as mental functioning was concerned").

Dr. Victor described the common effects of severe lumbar injuries on individual functioning.  The pain accompanying lumbar injuries commonly causes sleep difficulties.  Moreover, chronic pain is a source of psychological distress and often overlaps with depression and/or anxiety.  Mr. Dixon reported these effects.  EH 1 at 104-105.  Dr. Victor also described the common side effects of Valium and Percocet.  Valium's effects are both cognitive (difficulty processing information, impaired short term memory) and physical (balance, steadiness on one's feet).  Valium also has a disinhibiting effect.  EH 1 at 110-111.  Percocet can cause difficulty paying attention and processing information, as well as unsteadiness on one's feet as the result of lowered blood pressure.  EH 1 at 111.

---

[12]  Petitioner testified at the evidentiary hearing, and provided his own account of his back injury, medications, and subjective experience of pain and impairment around the time of the homicide. Nothing in his testimony cast doubt on the basis for Dr. Victor's conclusions.

1    Dr. Victor characterized the potential combined effects of Valium and Percocet as a

2  "horrific synergy" with respect to undermining a person's physical balance.  EH 1 at 112.  The

3  interaction between the drugs is unpredictable.  Moreover, the disinhibiting effects of the

4  medication are not apparent to the patient – indeed, the cognitive side-effects of the drugs

5  compromise the ability to recognize their impacts.  A person' ability to apply rules of conduct can

6  also be compromised.  EH 1 at 112-113.

7    Dr. Victor opined that the combination of factors affecting petitioner's functioning on the

8  day of the shooting – chronic pain from lumbar injury, and its effects; chronic sleep deprivation,

9  and its effects; and the effects of both Valium and Percocet – are inconsistent with petitioner

10 recognizing that his conduct posed a danger to the people around him.[13]  Those same factors are

11 inconsistent with petitioner having an intentional disregard for any danger.  EH 1 at 117.

12    In reaching this conclusion, Dr. Victor considered the discrepancies between petitioner's

13 trial testimony about the shooting and the testimony of petitioner's father and wife.  (Most

14 significantly for present purposes, petitioner's father and wife testified that petitioner had been

15 upset and angry at the time of the shooting, and petitioner had denied this.)  Dr. Victor entertained

16 the possibility of conscious misrepresentation, but concluded that a more likely explanation was

17 the deterioration of petitioner's short-term memory due to the side effects of the medications.

18 The combination of petitioner's lack of sleep and the effects of medication "would explain the

19 lion's share" of the disparities in recollections.  EH 1 at 115-116.  These factors would have

20 impaired both petitioner's contemporaneous awareness of his emotional state and behavior, and

21 his subsequent memory of events.  EH 1 at 116-117.

22    On cross-examination, Dr. Victor was challenged about the consistency of his opinion

23 with the videotape of petitioner's post-arrest interview, which had been shown to the jury at trial

24 but which Dr. Victor had not previously viewed.  EH 1 at 136.  Eight excerpts of the videotape

25  _____

26 [13]  On cross-examination, Dr. Victor denied any inconsistency between his opinion that
   petitioner's mental state was impaired by uncontrolled back pain and his opinion that petitioner's

27 mental state was simultaneously impaired by pain medication.  Medication can have negative
   side-effects while providing an inadequate level of relief.  EH 1 at 126-128.

28

1   were played.  As to each clip, Dr. Victor opined that petitioner's ability to speak coherently,

2   provide an account of events, and perform some logical functions was not inconsistent with the

3   specific cognitive impairments that Dr. Victor had identified.  EH 1 at 138-156.  To summarize

4   Dr. Victor's testimony in this regard, neither cognitive functioning generally nor awareness of

5   surroundings in particular is an all-or-nothing phenomenon.  The particular mix of capacity and

6   impairment demonstrated by petitioner on the day of the shooting is consistent with cognitive

7   disturbance which negates subjective appreciation of risk.

8        Counsel for respondent also suggested on cross-examination that there was an

9   inconsistency between the propositions (1) that petitioner had been made drowsy and was

10  sometimes "knocked out" by medication, and (2) that he suffered from sleep deprivation.  EH 1 at

11  128-130.  The court finds this line of impeachment unconvincing.  Drowsiness is an entirely

12  different thing from restful sleep.  Even loss of consciousness, when medication-induced, does

13  not result in restful sleep.  These are matters of common experience.  Jurors do not need expert

14  testimony to understand that sleep interrupted by pain, or the quality of which is impaired by

15  pain, does not preclude the effects of sleep deprivation.

16       Overall, Dr. Victor was a credible and persuasive expert witness.  Cross-examination did

17  not materially undermine his testimony.

18       2.  Firearms Evidence

19       Celia Hartnett is a forensic science consultant who testified as a firearms expert.  EH 1 at

20  36.  In 2004, she and her colleague John Jacobson reviewed Faye Springer's report and

21  independently examined the gun.  As the Lab Director, Harnett had signed off on the report by

22  Jacobson that was submitted in support of the petition and considered on the motion to dismiss.[14]

23  Hartnett personally observed Jacobson's simulation of the incident.  Hartnett opined that

24  petitioner's hand had not been injured by collision with the gun's rear sight, as Springer

25  concluded, but by forcible contact with the safety switch when the gun struck an object or

26  ////

27  _____

[14]  Jacobson currently works for ATF and was not available to testify.

28

31

surface.[15]  Harnett further opined that the safety switch could be accidentally moved into the "fire" position by such contact.  EH 1 at 45-48.  The shotgun was produced at the hearing and Harnett re-enacted the simulation.

The undersigned visually inspected the gun, handled it, and examined the safety switch. The surface of the switch is serrated.  The undersigned (who was not wearing protective gloves) mimicked the experiment that Hartnett and Jacobson performed, by forcefully sliding a hand down the top of the gun so that the webbing between the thumb and forefinger pushed into and over the safety switch.  The switch proved capable of being moved in this way, but the force necessary to change its position from safety position to firing position would have bruised and/or painfully abraded the thumb webbing.  The undersigned declined to exert that much force.  Direct examination of the gun reinforced the credibility of Jacobson's report and Hartnett's testimony, and supports a conclusion that the safety could have been released inadvertently.  The court also finds that pushing the webbing between the thumb and forefinger against the safety switch with enough force to move the position of the switch would have caused injury to the webbing, consistent with the injury to petitioner's hand.

III.     Analysis under Strickland v. Washington

A.  Reasonableness of Counsel's Performance

As noted above regarding the sufficiency of petitioner's prima facie case, a defense lawyer's presumably strategic decision not to pursue a certain line of defense or present certain evidence is entitled to deference as reasonable only to the extent that it was supported by reasonable investigation.  See Strickland, 466 U.S. at 690-91; Jones v. Wood, 114 F.3d at 1010. Here counsel did not conduct a preliminary investigation adequate to inform a reasonable decision whether or not to present mental state evidence or a defense firearms expert.

1.  Failure to Investigate Mental State

The only factual disputes at petitioner's murder trial involved intent.  Petitioner was charged with an open count of murder, CT 12, and the prosecution was trying the case on an

---

[15]  According to Hartnett, this could have been a human torso.

1   implied malice theory, RT 538, 555-59.  The primary question for the jury was whether petitioner

2   had acted with knowledge of the danger presented by his conduct, and conscious disregard for the

3   consequences to human life.  See Knoller, 41 Cal. 4th at 143, 151 (discussing elements of implied

4   malice second-degree murder).  Accordingly, defense counsel's goal was to raise a reasonable

5   doubt about petitioner's subjective appreciation of the risk he posed when he brought his loaded

6   shotgun into the room where his wife, father, and Barry O'Connell were readying to leave the

7   house.

8         Counsel failed to have petitioner's post-arrest blood sample tested for the presence of

9   mind-altering drugs, despite knowledge that petitioner used several prescription painkillers and

10  muscle relaxants.  Counsel specifically knew that petitioner was taking Percocet, and that the

11  county lab report did not report the presence of opiates.  Counsel's failure to investigate this

12  discrepancy, when the potential evidentiary significance of opiate use should have been self-

13  evident, is inconsistent with the basic duty to investigate.  See Jones v. Wood, 114 F.3d at 1011-

14  1012 (recognizing that failure to test blood evidence is unreasonable if evidence has potential

15  exculpatory value); Duncan v. Ornoski, 528 F.3d 1222, 1236 (9th Cir. 2008) (reasonable

16  performance requires inquiry into discrepant lab report), cert. denied, 556 U.S. 1131 (2009).

17        It was also unreasonable for counsel to conduct no preliminary inquiry into the

18  information that could be provided by petitioner's treating physician.  Counsel knew from the

19  outset of the case that petitioner was under a doctor's care.  Because counsel never spoke to Dr.

20  Yokoyama, they cannot have made a reasonable decision that his testimony would not be useful

21  to the defense.  See Riley v. Payne, 352 F.3d 1313, 1318-19 (9th Cir. 2003) (failure to interview

22  potential witness defeats argument that failure to present his testimony was reasonable strategic

23  choice), cert. denied 543 U.S. 917 (2004).  Counsel did not even seek Dr. Yokoyama's files until

24  the case was three weeks from the anticipated trial date, which demonstrates a lack of due

25  diligence regarding an important issue.  Petitioner's back injury and medications were quite

26  obviously relevant to his claim that that the gun went off when he stumbled and began to fall,

27  because impaired mobility or balance can contribute to stumbling and falling.  Information from

28  ////

33

1   petitioner's treating physician was therefore plainly relevant to the accident theory that counsel

2   were pursuing.[16]

3        The belatedly-obtained records contained potentially useful information in this regard, but

4   counsel failed to follow up.  The medical records also contained illegible portions that counsel

5   made no efforts to interpret prior to trial.  Counsel took no steps to understand the medical

6   significance of petitioner's course of treatment with Dr. Yokoyama, whether the prescribed

7   medication was having its desired effect, or whether petitioner was experiencing adverse side-

8   effects.[17]  This failure to explore readily available evidence of clear relevance to the defense

9   cannot be reconciled with reasonable investigation.  See Evans v. Lewis, 855 F.2d at 636-37

10  (finding unreasonable performance where counsel failed to investigate mental state despite

11  possession of documents indicating impairment).

12       Counsel suggested at the evidentiary hearing that they did not need to talk to Dr.

13  Yokoyama because they knew enough about petitioner's back injury and prescriptions from

14  petitioner.  See EH 2 at 59 (testimony of Kenneth Rosenfeld) (counsel relied on petitioner's

15  medication bottles for drug and dosage information, and on their client for information about his

16  condition).  Since neither counsel nor petitioner were physicians or medical experts, this reliance

17  was unreasonable.[18]  For the same reason, presenting petitioner's testimony about his back injury

18

---

19  [16]  The supposed conflict between this accident theory and a mental state defense based on pain
    and/or medication cannot justify failing to investigate Dr. Yokoyama, because without talking to
20  him counsel were in no position to determine whether his information was inconsistent with their
    theory.  Moreover, as discussed more fully below, accident and impaired mental state are not
21  inconsistent theories on the facts of this case.

22  [17]  When asked about his understanding of Dr. Yokoyama's assessment of petitioner's condition,
    based on the medical records, Rosenfeld answered "I'm not a doctor," "I'm not going to speak for
23  Dr. Yokoyama," and "I am not a medical expert" – EH 2 at 57-59 – while acknowledging that he
    was unable to read the doctor's notes and had never spoken to the doctor.

24  [18]  Moreover, at the time counsel requested the medical records, they apparently *did* appreciate
    the potential value of input from a medical professional.  Miller's April 22, 2001 letter to
25  petitioner said in part, "If you have a 'favorite' pharmacist or physician who would be willing to
    support our theory of the case regarding your medication, please inform me within the week."
26  Trial File at 761.  It is objectively unreasonable to delegate the selection of an expert witness or
    consultant to a client.  It is equally unreasonable to indicate the need for an expert and then fail to
27  consult one before deciding that expert testimony is unnecessary.

28

1    to the jury without medical corroboration was unreasonable.  As the Ninth Circuit recently stated

2    in case involving the failure to present medical evidence of sleepwalking in defense to attempted

3    murder,

4                 Equating lay testimony on a medical subject with the testimony of
                  [a] qualified doctor[] makes no sense.  One doubts that there is a
5                 lawyer alive who, with doctors available to prove a medical
                  condition, would use lay witnesses instead, especially in a criminal
6                 trial where a defendant needs only a reasonable doubt to prevail.

7    Liao v. Junious, 812 F.3d 741, __; 2016 U.S. App. LEXIS 1496 at *29 (9th Cir. 2016).

8           Respondent contends that counsel made a strategic decision, after appropriate inquiry, not

9    to further investigate mental state issues.  The argument is unconvincing, because counsel's

10   minimal efforts could not support a reasonable professional judgment to limit their investigation.

11   See Strickland, 466 U.S. at 690-91.  Miller's cursory review of product information regarding

12   diazepam (but not oxycodone) on the internet, and Rosenfeld's informal "consultation" with a

13   CVS pharmacist apparently chosen at random, were grossly inadequate to support a conclusion

14   that petitioner's medical condition and the effects of his medications were unworthy of further

15   investigation.[19]  Rosenfeld testified that "our experts that we spoke to said they would be more

16   harmful than helpful when cross-examined regarding dosage and the size of – the general size of

17   somebody in Mr. Dixon's exact height and weight."  EH 2 at 46, ECF No. 79 at 48.  This

18   testimony is unsupported by the record.  There are no defense expert reports documenting any

19   such opinion.  Rosenfeld conceded that the pharmacist's "opinion" was offered informally and on

20   the basis of minimal information, without review of petitioner's medical history and records.

21   There is no basis for a conclusion that the CVS pharmacist was qualified to render any expert

22   opinion at all, even a preliminary opinion that would support a decision to investigate no further.

23          Even assuming the pharmacist was qualified to advise counsel about the likely general

24   effects of Valium and Percocet on a person of petitioner's size, counsel cannot reasonably have

25   considered this to be a sufficient basis to reject further investigation of medical and mental state

26   _____

27   [19]  Indeed, the diazepam information included the fact that the drug can cause ataxia, which
     would explain the sudden loss of muscle control while walking.  This information called for
     further inquiry, not the aborting of inquiry.

28

1   issues.  Without consideration of petitioner's background, medical history, current medical

2   condition, and other factors affecting his physical and mental functioning, a pharmacist's input

3   regarding drug effects was of little value.  Counsel defending a murder case cannot have

4   reasonably relied on such limited information to conclude that all investigation of medical and

5   mental state issues was a waste of effort.  See Jennings v. Woodford, 290 F.3d at 1013, 1016

6   (unreasonable for counsel to exclude mental state defenses on the basis of a brief preliminary

7   interview and competency assessment by a psychiatrist).

8   Because counsel prematurely and unreasonably concluded that no viable mental state

9   defense was available, the failure to consult a forensic mental health expert was likewise

10   unreasonable.  See Strickland, 466 U.S. at 690-91 (counsel's strategic decision only reasonable to

11   the extent it is supported by reasonable investigation).

12   Finally, Miller testified at the evidentiary hearing that he did not interview Mark Graybill

13   or other friends familiar with petitioner's impairments because he did not think that such

14   information was relevant.  EH 100.  It was unreasonable to so conclude without talking to the

15   available witnesses, learning what they had to say, and assessing their ability to testify

16   persuasively.  See Riley, 352 F.3d at 1318-19.  The relevance of petitioner's physical and mental

17   impairments was undeniable, and the wholesale rejection of percipient lay witness testimony

18   lacks an reasonable strategic justification.

19   Trial counsel suggested at the hearing, and respondent has argued, that mental state

20   evidence would have been inconsistent with the accident defense pursued at trial.  That is

21   nonsense.  Evidence of factors that affect both physical and cognitive functioning, such as a

22   severe back injury being treated with powerful pain-killers, can support both prongs of a

23   comprehensive yet simple, and fully integrated, defense theory: that the gun discharged

24   accidentally when the physically impaired defendant stumbled, and that the defendant did not

25   appreciate the potential for such an accident because of his medications.[20]  In any event, counsel

26

---

[20]  This approach preserves the opportunity to seek outright acquittal on accident grounds, while
27   providing for a result less severe than a murder verdict if the jury does not accept the accident
theory.  Under California law, subjective appreciation of risk distinguishes second degree murder
28   (continued…)

1   were in no position to determine whether accident and impaired mental state were consistent or

2   inconsistent defenses without first identifying and evaluating the available evidence.  See Rios v.

3   Rocha, 299 F.3d 796, 807, n. 18 (9th Cir. 2002) (". . . there is no possible justification for failing

4   to at least conduct a preliminary investigation of both defenses before choosing one or both").

5          Moreover, counsel's claim of conflicting defenses is undermined by their own files, which

6   demonstrate that they did in fact intend to present state of mind evidence,[21] and by counsel's

7   presentation at trial of petitioner's largely uncorroborated testimony regarding his back pain and

8   medications.  It is patently unreasonable for counsel in a murder case to put their client on the

9   stand and ask him about medical conditions and medication effects for which counsel has not

10   marshalled the available corroborating evidence.  Liao, supra.  It was entirely predictable in this

11   case that the prosecutor would attack petitioner's credibility, and would specifically attack the

12   absence of corroboration for the medical and mental state testimony.  The prosecutor's sarcasm in

13   this regard practically singes the transcript page:

14              Where was just some basic corroboration in this case of anything
               the defendant said? . . . How about some sort of records to show
15              that in fact he really was suffering from a back injury?  . . . [H]e
               told Detective Keller even Pac Bell [petitioner's employer] was
16              looking for some sort of documentation on his back injury.  How
               about something like that?  How about you – how about an expert?
17              How about a doctor?  How about somebody to come in here and
               say you know what, this whole memory loss thing, that's a real
18
               concern. . .   How about anybody to say this is a really true,
19              legitimate thing?

20   RT 549.

21          Counsel set their client up for this evisceration of his credibility.  Doing so cannot be

22   reconciled with reasonable performance.  See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th

23   Cir. 1995 ) ("An attorney 'must provide factual support for the defense where such corroboration

24   is available.' . . . Failure to pursue such corroborating evidence with an adequate pretrial

25

26   _____

27   from criminal negligence and manslaughter.  People v. Watson, 30 Cal. 3d 290, 296-97 (1981);
     see also People v. Dellinger, 49 Cal. 3d 1212, 1217-19 (1989).
     [21]  E.g., Trial File at 761 (letter referring to "our theory of the case regarding your medication").
28

1   investigation may establish constitutionally deficient performance.") (internal quotation and

2   citations omitted), cert. denied, 517 U.S. 1111 (1996).

3           2.   Failure to Investigate Firearms Evidence

4           Counsel failed to consult any firearms expert about the validity of the Springer report, the

5   functioning of the shotgun, or the consistency of petitioner's hand injury with petitioner's version

6   of events.  It was entirely predictable that the prosecution would rely on Springer's opinion that

7   the gun, and the safety switch in particular, operated normally.  Because defense counsel never

8   conducted the sort of preliminary investigation necessary to an informed strategic decision

9   whether to present such evidence, counsel's omissions at trial cannot be deemed reasonable.  See

10  Jones, 114 F.3d at 1011-1012 (recognizing that failure to test physical evidence is unreasonable

11  when that evidence is central to liability); Duncan v. Ornoski, 528 F.3d 1222, 1235-39 (9th Cir.

12  2008) (finding deficient performance where counsel failed to retain an expert to evaluate physical

13  evidence and review crime lab reports), cert. denied, 556 U.S. 1131 (2009).

14          B.   Prejudice From Counsel's Errors

15          A jury would of course have been free to reject any or all of the exculpatory testimony

16  presented at the evidentiary hearing.  The test for prejudice, however, is whether there is a

17  reasonable probability of a different outcome, defined as a probability sufficient to undermine

18  confidence in the verdict.  Strickland, 466 U.S. at 693.  For the reasons now explained,

19  petitioner's evidence undermines confidence in his second-degree murder verdict.  It is

20  reasonably likely that this evidence would have raised a reasonable doubt both as to petitioner's

21  subjective appreciation of risk in light of his medical condition and cognitive impairments, and as

22  to whether he had deliberately released the gun safety.  Doubt on either of these issues would

23  have been sufficient to defeat a finding of implied malice.

24          1.   Mental State and Subjective Appreciation of Risk

25          Independent testing of petitioner's blood sample would have confirmed that he was taking

26  both Valium and Percocet at the time of the shooting.  Such evidence would have corroborated

27  petitioner's testimony about his medications, and laid the groundwork for expert testimony about

28  the effects of those drugs.

Dr. Yokoyama's testimony would have provided the jury with an understanding they otherwise lacked of petitioner's medical condition and the factors that affected his physical and mental functioning in the weeks leading up to the homicide.[22] Dr. Yokoyama saw petitioner four times in a two month period immediately preceding the shooting, including a visit only eight days before, so his testimony regarding petitioner's contemporaneous physical condition and struggle to achieve effective pain control would likely have been granted weight by the jury.  Dr. Yokoyama's testimony would have corroborated the testimony of petitioner and his wife regarding his back pain, and increased the likelihood that their testimony on that issue was accepted as credible.  See Luna v. Cambra, 306 F.3d 954, 961 as amended by 311 F.3d 928 (9th Cir. 2002) (finding prejudice where counsel failed to present available witnesses to corroborate petitioner's testimony).  Had Dr. Yokoyama testified, the prosecutor would have been unable to excoriate the defense for failing to present medical evidence of petitioner's back injury.  See Liao, 812 F.3d 741, 2016 U.S. App. LEXIS 1496 (finding prejudice where counsel's failure to corroborate defendant's medical condition led to devastating cross-examination and ridicule of defense theory by prosecutor).  Most importantly, Dr. Yokoyama's testimony would have laid the groundwork for an expert opinion like that of Dr. Victor.

Dr. Victor's opinion was based entirely on information that was available prior to petitioner's trial.[23]  Accordingly, had counsel consulted with Dr. Victor or a similar expert, the jury could have heard expert opinion testimony comparable to that of Dr. Victor at the evidentiary hearing.  Such testimony could have made all the difference to the outcome of the trial.  As the undersigned has previously noted, ECF No. 35 at 17-18, the second degree murder case against

---

[22]  Petitioner could also have testified in greater detail about his subjective experience of these factors.  When presented in the context of testimony from Dr. Yokoyama and Dr. Victor, this testimony would have been significantly more credible than the testimony presented at trial and effectively impeached by the prosecutor.  The court's conclusions about the merits of the Strickland claim, however, do not turn on petitioner's own testimony.  The errors of counsel discussed above, and their likely effects, provide ample grounds for relief.

[23]  Although Dr. Victor's clinical interview was recent, he did not rely on petitioner's current mental state in formulating his opinion.  The medical, psychiatric and social histories that Dr. Victor took could have been obtained prior to petitioner's trial.

1   petitioner was weak at best.  The essential finding, that petitioner subjectively understood the risk

2   he created, logically depended on the implicit assumption that petitioner comprehended what a

3   reasonable, cognitively-intact person would have comprehended at the time of the homicide.  Dr.

4   Victor's opinion, if accepted by the jury, would have undermined that assumption and thus

5   defeated a finding of implied malice.

6        The evidentiary hearing demonstrated that Dr. Victor's opinion could withstand vigorous

7   cross-examination.  Dr. Victor explained how petitioner's cognitive impairments accounted for,

8   and were not inconsistent with, the fact that petitioner recalled his own emotional state differently

9   than percipient witnesses described it.  He explained how the combined effects of chronic pain,

10  sleep deprivation and medication side effects could have negated implied malice without

11  rendering petitioner incapable of perceiving, remembering and communicating the matters he

12  discussed in his videotaped police interview.  Cross examination on these issues demonstrated not

13  weaknesses in Dr. Victor's opinion, but the utility of expert testimony in countering common

14  misconceptions about mental state issues – including the erroneous belief that the ability to walk,

15  talk, and fetch a gun reflects a level of functioning that also includes awareness of risk.  The jury

16  would not have been compelled to accept Dr. Victor's opinion, and could have convicted

17  petitioner even after hearing his testimony, but that is not the test for prejudice under Strickland.

18  See Brown v. Myers, 137 F.3d 1154, 1157 (9th Cir. 1998) (petitioner need not show by a

19  preponderance of the evidence that the result would have been different, but must present

20  evidence that undermines confidence in the outcome).  Dr. Victor's testimony undermines

21  confidence in the outcome and thus establishes prejudice from counsel' errors.

22        Finally, the court finds that Mark Graybill would have made a favorable impression as a

23  witness, and the jury is likely to have credited his description of how petitioner's functioning

24  deteriorated following his back injury.  Standing alone, this testimony is unlikely to have affected

25  the verdict.  Together with the other evidence, however, Graybill's testimony would have

26  solidified the picture of petitioner as impaired by injury, pain and medication and acting out of

27  character as a result.  When considered as an integral part of the mental state evidence as a whole,

28  Graybill's testimony increases the likelihood of a different outcome.

40

1    When all the post-conviction mental state evidence is considered together in light of the

2    evidence presented at trial, it creates a reasonable likelihood that at least one juror – and quite

3    possibly the entire jury – would have entertained a reasonable doubt regarding implied malice.

4                    2.   The Safety Switch As Circumstantial Evidence of Implied Malice

5    At petitioner's trial, the prosecutor expressly and repeatedly argued to the jury that

6    implied malice should be inferred from the fact that petitioner brought a loaded shotgun, with the

7    safety moved into the "fire" position, into a crowded room.  RT 557, 558, 564, 601, 605-606.  He

8    specifically relied on Faye Springer's testimony for the proposition that "the safety could not

9    have been accidentally moved from 'safe' to 'fire' [.]"  RT 605-606.

10   The testimony of John Jacobson or Celia Harntett would have raised a significant doubt

11   about that proposition.  Indeed, Jacobson and Hartnett's experiment convincingly demonstrates

12   that the safety switch could be accidentally moved to fire, and that such accidental moving of the

13   switch could cause a hand injury identical to the injury sustained by petitioner.  Even if a juror

14   was unconvinced by the defense scenario about the gun, the Jacobson-Hartnett testimony would

15   likely have cast doubt on the prosecution's claim that petitioner had deliberately moved the

16   switch.  Accordingly, this evidence undermined the evidentiary basis for an inference critical to a

17   finding of implied malice.  A reasonable doubt that petitioner deliberately put the gun in "fire"

18   mode necessarily creates a reasonable doubt that he knew his handling of the gun was life-

19   threatening.

20   It is not petitioner's job in habeas any more than it was at trial to prove how the gun

21   discharged, or to reconcile all the evidence in the case.  For Strickland purposes, it is enough that

22   petitioner's evidence regarding the safety switch undermines confidence in the verdict.

23                    3.   Petitioner Has Demonstrated A Reasonable Likelihood Of A Different Result

24   This court previously found that petitioner's post-conviction proffer satisfies the

25   McQuiggin v. Perkins standard for actual innocence, which is significantly more stringent than

26   the Strickland prejudice standard.  The court having now found the facts to be substantially as

27   alleged in the petition, and petitioner's evidence of innocence having withstood adversarial

28   ////

testing, the violation of petitioner's Sixth Amendment right to the effective assistance of counsel is clear.

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696; see also Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir. 1997) ("Ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.") (citation and internal quotation marks omitted). The second-degree murder verdict here was not overwhelmingly supported by the record, it was only weakly supported. As the court has previously noted, both the prosecution and defense theories of how the shooting occurred were based entirely on inferences from ambiguous circumstantial evidence. ECF No. 35 at 17. The evidence presented to this court significantly undermines the foundation for the inferences necessary to a finding that petitioner was subjectively aware of the life-threatening danger posed by his handling of the shotgun. Accordingly, petitioner has demonstrated a reasonable probability of a different result absent counsel's errors.

CONCLUSION

For all the reasons set forth above, it is HEREBY RECOMMENDED that the petition for writ of habeas corpus be GRANTED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 25, 2016

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE